[No. D058671. Fourth Dist., Div. One. Aug. 9, 2011.]

In re PHILIP HILL on Habeas Corpus.

COUNSEL

Patrick Morgan Ford for Petitioner Philip Hill.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Respondent The People.

OPINION

McDONALD, J.—Following a jury trial, Philip Hill was convicted of 23 counts of sexual offenses committed against two minors. In this petition for writ of habeas corpus (which we consider with his appeal on a different ground), Hill contends his convictions must be reversed because he was denied his constitutional right to effective assistance of counsel. He asserts his trial counsel did not properly investigate and prepare for trial:[1] his trial counsel (1) did not request and obtain copies of certain photographs before trial and (2) did not make reasonable efforts to retain an independent medical expert to assist in her preparation for trial and/or to testify at trial and contradict the testimony of the prosecution's medical expert. Because we conclude Hill's convictions must be reversed on the ground he was denied his constitutional right to effective assistance of counsel, we grant the relief requested in his petition for writ of habeas corpus.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On January 23, 2009, an information was filed charging Hill with nine counts of committing a lewd act against C.W., a child under 14 years of age (Pen. Code, § 288, subd. (a)),[3] five counts of committing a forcible lewd act against C.W. (§ 288, subd. (b)(1)), two counts of oral copulation against C.W. (§ 288a, subd. (b)(2)), two counts of unlawful sexual intercourse with C.W. (§ 261.5, subd. (d)), five counts of lewd acts against N.T., a child under 14 years of age (§ 288, subd. (a)), and one count of indecent exposure (§ 314, subd. 1). The information also alleged that Hill committed the section 288,

---

[1] In his appeal in *People v. Hill* (Aug. 9, 2011, D056963) (app. dism.), Hill contends the prosecution committed error under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] by not providing him with copies of colposcopic photographs taken of one of the alleged victims.

[2] The factual and procedural background is largely based on the record on appeal in *People v. Hill, supra,* D056963, which the petition incorporates by reference.

[3] All statutory references are to the Penal Code.

subdivision (a), and section 288, subdivision (b), offenses against more than one victim within the meaning of the one strike law (§ 667.61, subds. (b), (c) & (e)).

At trial, the prosecution presented witness testimony substantially as follows: During eighth grade (apparently between Sept. 2007 and June 2008), C.W. was upset and told her best friend, K.M., that Hill, her stepfather, had been touching her. C.W. asked her not to tell anyone. However, K.M. went home and told her mother, but asked her mother not to tell anyone. In or about September 2008, C.W. wrote K.M. a note stating that Hill did more than just touch her. C.W. said that Hill raped her when she was in fifth grade, but it had not happened for a while. Although C.W. asked her not to tell anyone, K.M. told her mother, and they discussed the matter with K.M.'s grandmother. When C.W. learned K.M. had told her mother about what happened with Hill, C.W. asked K.M.'s mother to tell C.W.'s mother about it. At a group meeting at K.M.'s home, K.M.'s mother told C.W.'s mother, Peggy, about C.W.'s allegations regarding Hill. C.W., K.M., and K.M.'s mother and grandmother were all crying, but Peggy was quiet and then asked C.W. why she had not said something to her before. C.W. replied that she did not think she (Peggy) would believe her. Peggy asked C.W. what had happened. Crying, C.W. said in effect that Hill had molested and penetrated her. Believing C.W., Peggy called child protective services (CPS) and took C.W. to Children's Hospital.

At the hospital, a social worker interviewed C.W., then 14 years old. The interview with the social worker was videotaped and the tape was played for the jury. C.W. told the social worker that Hill began touching her inappropriately when she was 10 years old. She said Hill's actions were "just always the same thing." Over a two-year period, every week Hill rubbed her breasts underneath her clothes and her lower area, stating "he just, just went in." He also forced her to grab his penis and move her hands while his hands were on top of hers. He also put his mouth on her breasts and vagina and licked her. When she was 12 years old, Hill threw her down on the bed, pinned her shoulders down with his hands, used one hand to cover her mouth, and "just stuck me right there." Afterward, it hurt for about 30 minutes, but she did not have any bleeding. She also had a discharge and thought, "that's kind of weird." Hill had sexual intercourse with and raped her once or twice a week for the following two years. She said the last incident occurred one month before the interview. C.W. also told the social worker that her friend, N.T., was at her (C.W.'s) home during some of the incidents involving Hill.

N.T. lived with C.W.'s family in 2007 while her mother was deployed in the Navy. On one occasion, Hill asked N.T. to go into the bathroom with him and, once inside, he hugged her from behind. She could feel his penis poking

her in her back. He put his hands under her bra and squeezed her breast, telling her he was checking for breast cancer. He tried to put his hand down her pants, but she stopped him. He then pulled out his penis and told her to look at it. After she covered her eyes and refused to look, he put it away. That same day, C.W. and N.T. discussed the bathroom incident and C.W. said Hill also touched her and tried to put his hand down her pants. They told C.W.'s mother, who then held a family meeting to discuss the incident. Hill explained he was merely checking the girls for breast cancer and to see if they were shaving their pubic areas. C.W.'s mother told the girls that Hill was only trying to help, but his actions were still wrong. She asked N.T. not to tell anyone. However, N.T. later told her godmother, who then told N.T.'s mother. Thereafter, N.T.'s mother would not let N.T. go to C.W.'s house again. C.W. and N.T. had no contact with each other for about a year.

On September 23 and 24, 2008, C.W. told Detective Donnie Sossaman that her mother was angry at her and pressuring her about her allegations against Hill. C.W.'s mother told her she should not have involved other people. C.W. said she might have to move from her home, change schools, and live in a foster home or with her grandmother.

On September 26, Sossaman recorded a telephone conversation she had with C.W.'s mother, which recording was played for the jury. C.W.'s mother admitted C.W. and N.T. told her that Hill had touched their breasts. Hill told her he had done so to check if they had breast cancer because they were complaining their breasts hurt. Hill had e-mailed her while she was deployed and asked her if he could check the girls' breasts.

About a week later, C.W. told her mother she wanted to commit suicide, and her mother called police. C.W. felt really guilty and did not "want to deal with it anymore."

On October 13, C.W. and her mother met with Linda Cone, an investigator employed by Hill's defense counsel. In a recorded conversation later played for the jury, C.W. told Cone that she had lied about her allegations against Hill and stated Hill had never touched her inappropriately. C.W. explained that Hill began imposing strict rules at home and made the allegations against him because she was really angry with him.

On November 18, Sossaman arranged a controlled call by N.T. to C.W., which was recorded and played for the jury. During the call, C.W. admitted to N.T. that she lied when she changed her allegations against Hill because she had felt pressured by her mother and was afraid of going into foster care. C.W. told N.T. that Hill had raped her almost every week since she was 10 years old.

On December 4, Katherine Toppin, a CPS worker, met with C.W, who told Toppin she had lied when she recanted her allegations against Hill. C.W. said she wanted the criminal proceedings against Hill to continue.

C.W. testified at trial that Hill had never raped her or touched her inappropriately.[4] She testified she made up the allegations because she wanted her boyfriend and her best friend, K.M., to feel sorry for her. Although she admitted she had reported she had sexual intercourse with Hill once or twice a week for two years, she testified she had never had sexual intercourse with anyone, including her boyfriend. Although Hill had been nice to her, she became mad at him when he began enforcing strict rules at home and grounded her for misbehavior. She wanted him out of the house and thought her false allegations of molestation would accomplish that. She admitted she had told Sossaman that Hill touched her vaginal area to check whether she was shaving it, but testified at trial that it never occurred. On cross-examination, C.W. testified N.T. lied and stole from her family.

The prosecution presented the testimony of Jennifer Davis, the physician at Children's Hospital who examined C.W. on September 10, 2008. If a reported sexual assault occurred more than 72 hours before an examination, a "non-acute" examination is performed during which the examiner looks for healed injuries and sexually transmitted diseases. Because C.W.'s examination was about one month after the last reported molestation, Davis did not expect to find any injuries. She explained that magnified photographs were taken of the genital area and anus to document whether they were normal or showed injuries. She did not include a speculum examination because this was not an acute case. Davis testified that C.W. had a "normal" anogenital examination and negative laboratory testing. She explained that 95 percent of nonacute examinations are normal because the hymen tissue covering the vagina is very elastic, heals very rapidly, and does not scar.[5] The tissue does not necessarily tear or bleed in the act of intercourse, even in a young girl. The prosecutor asked Davis: "Now, to give you a hypothetical question here, if you were told that a teenage girl was having *regular sexual intercourse on a regular basis over the course of two years*, based on that information, would you then expect there to be *any type of physical findings* given that when they came to you it was approximately a month since the last encounter?" (Italics added.) Davis answered: "No. *I wouldn't expect to see anything*. Based on the literature and the statistics that we know, I would not expect to see any findings." (Italics added.) Davis also testified that if a

---

[4] C.W. had previously testified at Hill's preliminary hearing that he had never touched her inappropriately and she had made up her allegations against him.

[5] In five percent of nonacute examinations, there is missing hymen tissue, which is called a "deep cleft" or a "healed [transection]." Davis did not see that during C.W.'s examination.

person infected with the herpes virus has sexual intercourse with an uninfected person during a period of up to two years, there is only a 4 to 10 percent chance the virus will be transmitted to the uninfected person. (C.W.'s mother had previously testified at trial that Hill had been infected with the herpes virus since 1987, while C.W. was uninfected according to a Nov. 2008 test.)

In his defense, Hill presented the testimony of friends and relatives who stated Hill was a truthful person of good moral character. In contrast, those witnesses knew C.W. to be untruthful and a compulsive liar. Hill testified in his defense. He served in the Navy for 20 years and was deeply religious. He met C.W. when she was 10 years old and he was dating her mother. He married C.W.'s mother in 2006. He was a loving stepfather to C.W. and cared for her while her mother was deployed or working in Los Angeles. C.W. did not like the rules he imposed for her, including performing household chores. Hill testified he never touched C.W. or N.T. inappropriately. He did not expose his penis to N.T. or try to reach down her pants. He never touched the breasts of C.W. or N.T. to show them how to check for breast cancer. He did not go into C.W.'s room at night and molest her. He did not show C.W. his penis or make her touch it.

The jury found Hill guilty on all charges except for count 21 (§ 288, subd. (a); lewd act against N.T.—touching N.T.'s breast). The jury found true the related enhancement allegations. The trial court sentenced Hill to a determinate term of 13 years four months (for counts 15–18, 22 & 23), and to 16 consecutive indeterminate terms of 15 years to life for the remaining counts (except for the count 24 misdemeanor of exposing himself for which the court imposed a sentence of 94 days with credit for time served). Hill timely filed a notice of appeal (which we consider with this petition). On December 2, 2010, Hill filed the instant petition for writ of habeas corpus. We requested and received an informal response from the People and an informal reply from Hill. On May 4, 2011, we issued an order to show cause (OSC) why the relief in the petition should not be granted. The People filed a response and Hill filed a traverse to the OSC.

## DISCUSSION

### I

*Constitutional Right to Effective Assistance of Counsel*

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684–685 [80 L.Ed.2d 674, 104 S.Ct. 2052]

(*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859], disapproved on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10 [25 Cal.Rptr.2d 867, 864 P.2d 40].) To show denial of that right, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691–692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 [233 Cal.Rptr. 404, 729 P.2d 839]; *Pope*, at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient. (*Strickland*, at pp. 693–694; *Ledesma*, at pp. 217–218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710].) It is the defendant's burden on appeal (or in a petition for writ of habeas corpus) to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.) "[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*Ibid.*)

■ "In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord·great deference to counsel's tactical decisions. [Citation.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979–980 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

■ Under the right to effective assistance of counsel, "the defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action—no matter how unobjectionable in the abstract—is professionally deficient." (*People v. Ledesma, supra,* 43 Cal.3d at p. 215.) Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant. (*In re Williams* (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784,

460 P.2d 984].) "The defendant can reasonably expect that before counsel undertakes to act, or not to act, counsel will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*In re Fields* (1990) 51 Cal.3d 1063, 1069 [275 Cal.Rptr. 384, 800 P.2d 862].) "[T]o render reasonably competent assistance, an attorney bears certain basic responsibilities, including the *investigation of available defenses* . . . ." (*People v. Frierson* (1979) 25 Cal.3d 142, 160–161 [158 Cal.Rptr. 281, 599 P.2d 587], italics added.) "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland, supra,* 466 U.S. at pp. 690–691.) ■ "[A] *defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach key prosecution witnesses, renders deficient representation.* [Citations.] ■ California case law makes clear that counsel has an *obligation to investigate all possible defenses* and should not select a defense strategy without first carrying out an adequate investigation." (*In re Edward S.* (2009) 173 Cal.App.4th 387, 407 [92 Cal.Rptr.3d 725], italics added.)

■ We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Strickland, supra,* 466 U.S. at p. 690.) Furthermore, we must consider the seriousness of the charges against the defendant in assessing counsel's performance. (*In re Jones* (1996) 13 Cal.4th 552, 566 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

II

*Trial Counsel's Deficient Performance*

Hill contends he was denied effective assistance of counsel because his trial counsel did not properly investigate and prepare for trial by (1) not requesting and obtaining copies of C.W.'s colposcopic photographs before trial and (2) not making reasonable efforts to retain an independent medical expert to assist in her preparation for trial and/or to testify at trial and contradict the testimony of Davis, the prosecution's medical expert.

A

In support of his petition, Hill submits declarations from (1) Lisa Berman-Hernandez, Hill's trial counsel; (2) Lynne Susanne Ticson, M.D., a medical expert; and (3) Kathleen A. Coyne, a criminal defense expert. Because those declarations provide the primary bases for Hill's assertion that he was denied effective assistance of counsel, we provide a detailed discussion of those

declarations to allow a more complete understanding of our determination of the merits of his ineffective assistance claim.

*Hill's trial counsel.* Berman-Hernandez declares that at the time she represented Hill at trial, she was employed by Kerry Steigerwalt's Pacific Law Center, had a hectic case load, and took over the case from another attorney who had left the firm shortly before trial. She states that her "trial strategy was to show that [C.W.] lied about the initial allegations and was truthful when she recanted, and that [N.T.] lied about her allegations." She further states:

"6. While I had been provided with a copy of the forensic medical report . . . prepared by the Children's Hospital doctor [i.e., Davis] who examined [C.W.], I overlooked the notation in the report showing that the doctor had taken colposcopic photographs during the examination. I therefore never requested that I be given a copy of the photos and the prosecutor . . . never informed me about the photos.

"7. I spoke with two medical doctors about the case. The first was Dr. Joyce Adams, who is affiliated with Children's Hospital—Chadwick Center. . . . While I discussed the case with Dr. Adams, she informed me that she would not be able to help in light of her position with the SART Team at the Chadwick Center.

"8. I also spoke with Dr. John Goldering about Dr. Davis's conclusions. I don't recall exactly what he said about Dr. Davis's conclusions that 'no findings' in an exam is not inconsistent with molest, but I do recall him saying he probably would not be a good witness. I also questioned him about the probability of someone with the herpes virus infecting someone who did not have the virus after multiple incidents of sexual intercourse. He informed me that no disease is 100% contagious but he did not offer statistics and I did not inform him of Dr. Davis's opinion that there was only a four to ten percent chance that an uninfected person would contract the disease after repeated acts of intercourse." She further states: "I had no tactical reasons for not pursuing a medical defense showing [C.W.] was never molested, and for not obtaining the colposcopic photographs."

*Hill's posttrial medical expert.* Hill's current counsel declares that he contacted Ticson for assistance regarding certain medical issues relating to this petition. Ticson provided him with a declaration. Ticson has been a board-certified pediatric physician since 1985. Since 1995, she has been the associate medical director of the Los Angeles County-USC Medical Center's Department of Pediatrics center for the vulnerable child and sexual assault center. In her declaration, Ticson states she reviewed Davis's trial testimony,

her report on her forensic examination of C.W., the interview of C.W. by the social worker, and the colposcopic photographs taken by Davis during C.W.'s examination. Ticson has performed colposcopic examinations for 26 years. Based on her review, Ticson states that Hill's convictions were "likely based on the testimony of a young physician who stated that sexual intercourse may occur and there may be no clinical findings on the exam of the alleged victim, and that if there were findings initially in this case, they would have healed by the time that [Davis] did the exam on [C.W.]." Ticson explains:

"After 100–200 penile-vaginal penetrations, the hymen would not be expected to appear 'normal.' The tissue may appear grossly to have no acute injuries and no transections, either acute or older, but the hymen would not appear 'normal' under microscopic magnification of the tissue, i.e., using the colposcope. It would not have the same appearance as a hymen that had minimal penetrations or that never had any penetrations at all. Experts are able to describe a 'normal' hymen in a sexually active teen, in this respect. . . . The hymen of a sexually active teen or adult has certain characteristics:

"1. rounded edges on the hymen[;]

"2. attenuation of the hymen—a shortening from the base to the edge of the hymen[;]

"3. though the hymen appears intact, a wide or ·a distensible vaginal opening upon forward and lateral traction of the hymen by the examiner holding the labia[; and]

"4. a leathery appearance to the hymen itself . . . .

"All of the above characteristics of a sexually active teen's hymen may occur with the hymen still being intact. To say that a 'normal' exam, i.e., no [transections], can be found with an intact hymen and that vaginal penetration may also have occurred, is true but misleading. In this case, there were 100–200 penetrations, which would have caused changes in the hymen. . . ."

Ticson explains how C.W.'s hymen would not have appeared normal if she, in fact, had sexual intercourse 100 to 200 times over a two-year period: "[Davis] stated that when [C.W.] was examined, since a month had passed, that the hymenal tissue would have healed[,] i.e., there would be no evidence that trauma had occurred, if it had occurred, one month prior. While it is true that most minor trauma such as small abrasions, bruises . . . and hemorrhaging . . . will heal without any trace of trauma as far as one month out, partial tears and complete tears in the hymen *do not ever heal so that the*

*edges come together again and the hymen appears as normal.* The edges and depth of the hymen will always appear as tears or [transactions] that have healed. That these are truly tears can be confirmed by using the colposcope and looking at the hymenal edges. With a hymen that is worn (attenuation of the hymen to its base) from hundreds of penetrations, there is no regeneration." Ticson states that "[l]acerations [of the hymen] don't heal so that there is no evidence that they ever existed. . . . The edges of deeper hymenal transections that are down to the base never heal together . . . , and are blatantly obvious when seen through the colposcope." Citing Davis's trial testimony that she would not expect to see any physical findings on the hymen of a teenager who has been having regular sex for two years, Ticson minces no words, stating: "She [(Davis)] is dead wrong. . . . [T]here are subtle and not so subtle tissue changes that can be seen using the colposcope. That is the whole point of using a colposcope." Regarding Davis's testimony that " 'a normal exam is consistent with any history that could be given,' " Ticson states: "[t]his could be misleading to anyone who hears that statement. What [Davis] too simply means is that [C.W.], one month after the last episode of alleged penile-vaginal penetration, and with a history of 100–200 penetrations over a two year period, had a 'normal exam[,]' i.e., only that there were no acute injuries and there were no findings of old, healed transections."

Ticson also strongly disagrees with Davis's testimony that there was only a 4 to 10 percent infectivity rate of an uninfected sexual partner by a partner infected with the herpes virus. She notes that although Hill's infection with the herpes virus apparently had been clinically confirmed and was supported by blood tests, C.W. tested negative for HSV (herpes) antibodies and therefore "has never been exposed to HSV." Ticson states: *"There is a 50% infectivity rate . . . for each contact event,* whether a person has or does not have clinical symptoms or lesions." Referring to Davis's testimony that " 'from 4 to 10 percent of the uninfected partners will be infected within about a year or two,' " Ticson states: "[i]t is unknown where these statistics came from or if they apply to children and teens." Ticson observes: *"Forensically speaking, a blood test for herpes is most valuable when the* [alleged] *perpetrator is positive and the* [alleged] *victim is negative or vice versa."* She states: "[W]hile herpes may be ubiquitous, a positive male perpetrator and a negative female victim, after sexual activity for 2 years, without protection, would be a highly unlikely situation. The blood testing in this case is strong proof for just this[:] Mr. Hill is clinically[,] and by blood testing, positive for HSV, while the alleged victim [(C.W.)] is negative by clinical history and by blood testing for any exposure whatsoever to both types of herpes virus. This tells us that the likelihood of Mr. Hill having had sex, i.e., vaginal penetration of the alleged victim, while within the realm of possibility, is not highly probable."

Ticson also criticizes Davis for her failure to perform a Pap smear and a speculum exam on C.W., stating: "With a history that she believed, of 100–200 penetrations over a 2 year period of time, and with a partner who had herpes, the clinical findings on the cervix would be extremely important. Theoretically, such a cervix might have had visible pathology and a Pap smear was definitely needed in this teen for evidence collection. Does the Pap show herpetic inclusions, and is the Pap abnormal from chronic inflammation? To say a Pap was not needed in this case and was not the right thing to [do] is more of a lay-person's view, and it seems odd that a doctor who claims to be a forensic expert would have that opinion or perhaps she is not so skilled at doing a Pap on a teen without thinking that it is torture. _It most certainly is the standard of care to do a thorough exam_, especially when it concerns a possible finding of an STD that is chronic and needs continued follow up, as HSV can cause cervical cancer. To have that attitude is a disservice to the patient."

Ticson also opines that "[f]orensic evidence, in this case, in the form of [colposcopic] photos, should be reviewed for an accurate assessment only by competently trained and experienced experts."

Ticson also extensively discusses the allegations C.W. made against Hill during her initial forensic interview with the social worker, noting that although C.W. could remember details of conversations, she could not provide much, if any, detail regarding the alleged molestations. Ticson observes that C.W. "remembers conversation line for line in detail but has made only general and vague statements about different sexual acts happening to her. . . . [S]he is a poor historian for the acts perpetrated on her."

In conclusion, Ticson states: "In sum, [C.W.], who is 14 years old, contradicts herself and is inconsistent when questions are asked twice; she doesn't seem to realize it and offers no explanation. She does not give detail for the alleged sexual activity. The forensic exam is normal and is not consistent with a history of multiple (100–200) vaginal penetrations over a 2 year timeframe. The lab testing for HSV confirms that [C.W.] has never come into contact with herpes, which Mr. Hill may readily transmit 50% of the time with each sexual contact. [C.W.] has recanted twice, but this seems to have no meaning. We might say that if we believe a child when they say that something happened, why is it that we refuse to believe the child when they say that nothing happened? Children sometimes recant if they don't feel safe, but this is not the case here."

_Hill's posttrial criminal defense expert_. Hill also submits the declaration of Coyne, a criminal defense expert with extensive experience in defending charges of child molestation. She reviewed the declarations of Berman-Hernandez and Ticson. In Coyne's expert opinion, "[t]here exists no sound

reason in this case for [Berman-Hernandez's] failing to obtain clinical photographs of the forensic medical examination performed on the complainant [(C.W.)] or to investigate the availability of an expert in the area [of] medical findings." Regarding the photographs, she states: "In San Diego [C]ounty, colposcopic photos are routinely taken during a forensic medical exam and routinely provided after executing a standardized protective order provided by the prosecution." She states: "In any case where the prosecution introduces testimony relating to physical findings in a child molestation prosecution, it is vital that defense counsel obtain any colposcopic photographs for review by an independent examiner."

Furthermore, Coyne states that the failure of defense counsel to investigate and use readily available independent experts to counter the prosecution's experts falls below the standard of care for effective representation in a criminal case. In this case, "medical expert consultation or testimony was critical to an effective defense. That such testimony was readily available upon routine investigation is apparent from the contents of Dr. Ticson's report." She explains: "[I]n cases such as the present one where a teenage child makes a report that would implicate significant medical findings, the absence of [findings of genital trauma] is an extraordinarily powerful weapon in the defense arsenal. It is therefore incumbent upon any defense counsel to examine with great care any purported medical evidence relating to physical findings of molest **or the absence of such findings where they would be expected.**" Based on her review of Ticson's declaration, Coyne states: "Ticson makes it clear that both the report of the prosecution witness, [Davis,] and her testimony were replete with overreaching, misleading and incorrect statements which were not supported by the state of the medical science and were extremely damaging to the defense case." Regarding Berman-Hernandez's apparent attempts to obtain the assistance of an independent medical expert, Coyne states: "In this case it would appear that trial counsel made a desultory effort to consult an expert but Dr. Joyce Adams indicated she was conflicted. Ms. Berman-Hernandez is not clear what information she shared with the second expert, Dr. John Goldering, does not state what his qualifications are and does not remember what his response was with regard to the medical issues in the case. But what is clear is that she did not share photographs of the examination, which she did not have, or the most troubling areas of Dr. Davis's testimony."

Coyne also implicitly criticizes the failure of Hill's trial counsel to investigate and present evidence on the absence of the herpes virus in C.W., stating: "Even more significantly in the instant case is the presence in the defendant of genital herpes and its complete absence in [C.W.]. This constitutes a sexually transmitted disease which is totally absent in the victim despite hundreds of alleged exposures between the complainant and the defendant according [to] the prosecution's theory of the case."

Coyne explains in detail why Hill's trial counsel should have obtained the assistance of a medical expert, stating: "Reliance on the 'junk science' presented by prosecution experts weakened the value to the defense of these denials [by C.W. of the alleged acts] to the point of futility. As the California Supreme Court has observed: 'Lay jurors tend to give considerable weight to "scientific" evidence when presented by "experts" with impressive credentials.' (*People v. Kelly* (1976) 17 Cal.3d 24, 31 [130 Cal.Rptr. 144, 549 P.2d 1240].) This is particularly true in cases, like [Hill's], where the expert is a medical doctor. Doctors are viewed with great respect and deference. They undergo rigorous and lengthy training and deal with life and death situations. A lawyer may convince herself that she can sufficiently peck away at a doctor's credibility to the extent of causing a jury to disbelieve the doctor. But *it makes no sense to completely fail to investigate whether another doctor whose expertise is similar* [to] *or greater than the prosecution's doctor has anything to contribute to the effort.* Nor is it likely the defense doctor would work at cross purposes with defense counsel. Instead, they can work in tandem to undermine the credibility of the prosecution expert using the ordinary techniques of cross-examination which counsel has mastered and the medical information the defense expert can provide. *Because trial counsel did not avail herself of readily available medical expertise, her examination of Dr. Davis was ineffectual.* The importance of this failure is underscored by the fact that Dr. Davis's testimony was obviously important to the jurors since they requested it be read back to them during deliberations." (Italics added.)

Coyne concludes: "*It is my opinion that failure to obtain and present for expert examination colposcopic photos and expert medical testimony in the instant case constitutes a departure from the standard of acceptable practice in defense of child molest offenses.* Based on my experience and [the declarations of Berman-Hernandez and Ticson,] I believe it is reasonably likely that if such a witness had been called the outcome of the trial would have been different since the case was predicated entirely on the accuracy and believability of the child witnesses. Based on these declarations and my experience in the representation of individuals charged with similar offenses[,] *I believe that counsel's failure to investigate these potential areas of defense denied* [Hill] *the effective assistance of counsel* and undermined confidence in the decision of the jury as contemplated by [*Strickland, supra,* 466 U.S. 668]." (Italics added.)

B

Based on our review of the record and the declarations of Berman-Hernandez, Ticson, and Coyne, we conclude Hill's trial counsel performed below an objective standard of reasonableness under prevailing professional

norms in representing him. (*Strickland, supra*, 466 U.S. at pp. 687, 691–692; *People v. Ledesma, supra*, 43 Cal.3d at pp. 215–217.) His trial counsel admits she had no tactical reason not to request and obtain the colposcopic photographs taken during C.W.'s forensic examination by Davis. Under prevailing professional norms in the circumstances of this case, effective trial counsel, acting reasonably, would have noted the reference to those photographs in Davis's report and, based on that knowledge, would have requested copies of those photographs. Effective trial counsel, acting reasonably, would then have been able to obtain those photographs from the prosecution subject to a standard protective order. As part of a reasonable investigation of all possible defenses and preparation for trial under prevailing professional norms, effective trial counsel, among other actions, would have consulted one or more medical experts in the field of child molestation, asked the expert to review the photographs, Davis's report, and other evidence, and conducted a *substantive* discussion with that expert regarding any possible medical or other defenses to the charges against Hill, including any errors or misleading statements by Davis or other weaknesses in the prosecution's case.

However, Hill's trial counsel did not act in accordance with those prevailing professional norms. Her declaration shows she did not notice the reference to the colposcopic photographs in Davis's report and therefore never requested copies of those photographs. Her attempt to consult medical experts for assistance in investigating and preparing possible defenses was wholly inadequate. She did not have any substantive discussion with Adams because she (Adams) had a conflict of interest (i.e., she worked in the same department at Children's Hospital as Davis). His trial counsel's discussion with Goldering apparently was superficial, at best, because she could not recall what Goldering said about Davis's conclusion that her "no findings" examination of C.W. was not inconsistent with the molestation charges. In any event, any opinion he rendered was not based on a review of all the relevant evidence, because he did not have the colposcopic photographs taken of C.W. Furthermore, Goldering apparently did not want to assist in Hill's defense, informing Hill's trial counsel that he probably would not be a good witness.[6] Because Hill's trial counsel did not obtain C.W.'s colposcopic photographs and did not make a reasonable attempt to obtain the assistance of an independent medical expert in the field of child molestation (e.g., from Dr. Ticson or another medical expert) to aid her in the investigation and preparation of possible medical defenses to the charges against Hill, his trial

---

[6] Furthermore, Goldering's opinion regarding transmission of the herpes virus was merely that it was not 100 percent contagious and did not address or refute Davis's opinion that there was only a 4 to 10 percent chance of transmission of the herpes virus from an infected person to an uninfected person even though they had sexual intercourse 100 to 200 times over a period of one to two years. Per Berman-Hernandez's admission, she failed to inform Goldering that Davis held that opinion regarding that low rate of transmission of the herpes virus.

counsel did not conduct a reasonable investigation of all defenses of fact and of law that may have been available to him. (*In re Williams, supra,* 1 Cal.3d at p. 175; *In re Fields, supra,* 51 Cal.3d at p. 1069; *People v. Frierson, supra,* 25 Cal.3d at pp. 160–161; *In re Edward S., supra,* 173 Cal.App.4th at p. 407 ["[A] defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach key prosecution witnesses, renders deficient representation. [Citations.] California case law makes clear that counsel has an obligation to investigate all possible defenses and should not select a defense strategy without first carrying out an adequate investigation."].)

Absent a reasonable investigation of all possible defenses and other reasonable preparation for trial, Hill's trial counsel did not have an adequate basis on which to make reasonable tactical decisions in planning and executing a defense strategy. (*In re Edward S., supra,* 173 Cal.App.4th at p. 407; *In re Fields, supra,* 51 Cal.3d at p. 1069.) "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland, supra,* 466 U.S. at pp. 690–691.) Based on Ticson's and Coyne's declarations, it appears that had a reasonable investigation been conducted by Hill's trial counsel, she would have learned of possible medical defenses to support the defense theory that Hill did not have sexual intercourse with or otherwise inappropriately touch C.W. and that C.W. and N.T. were lying when they reported their allegations against him. Had Hill's trial counsel reasonably investigated all possible medical defenses, she presumably could have obtained an opinion of a medical expert substantially as that set forth in Ticson's declaration that would have effectively contradicted, and possibly discredited, Davis's opinion that C.W.'s "normal" anogenital examination and colposcopic photographs were consistent with her claim that she had sexual intercourse with Hill from 100 to 200 times over a period of two years. Ticson states that if C.W.'s allegations were true, a colposcopic examination of her hymen would have shown obvious physical changes. In particular, Ticson wholly rejects Davis's trial testimony that she would not expect to see any physical findings on the hymen of a teenager who has been having regular sex for two years, stating: "[Davis] is dead wrong. . . . [T]here are subtle and not so subtle tissue changes that can be seen using the colposcope. That is the whole point of using a colposcope." Accordingly, had Hill's trial counsel reasonably investigated all possible defenses and consulted a medical expert, she presumably could have presented expert testimony that C.W.'s "normal" examination and colposcopic photographs showed C.W. could not have had sexual intercourse with Hill 100 to 200 times over a two-year period and therefore C.W.'s initial allegations to the contrary were false.

Furthermore, had Hill's trial counsel reasonably investigated all possible medical defenses, she presumably could have obtained an opinion of a medical expert substantially as that set forth in Ticson's declaration that would have effectively contradicted, and possibly discredited, Davis's opinion that there is only a 4 to 10 percent chance the herpes virus would be transmitted from an infected person to an uninfected person if they had sexual intercourse 100 to 200 times over a period of one to two years. Ticson states that there is a *50 percent* chance of transmission of the herpes virus for *each* sex contact by an infected person. She states: "[W]hile herpes may be ubiquitous, a positive male perpetrator and a negative female victim, after sexual activity for 2 years, without protection, would be a highly unlikely situation. The blood testing in this case is strong proof for just this[:] Mr. Hill is clinically[,] and by blood testing, positive for HSV, while the alleged victim [(C.W.)] is negative by clinical history and by blood testing for any exposure whatsoever to both types of herpes virus. This tells us that the likelihood of Mr. Hill having had sex, i.e., vaginal penetration of the alleged victim, while within the realm of possibility, is not highly probable."

In describing that statistical possibility as "not highly probable," we believe Ticson understates that statistical improbability. One need not be a highly educated statistician to conclude that if there is a 50 percent chance of transmission of the herpes virus each time an infected person has sexual intercourse with an uninfected person, it is almost a statistical certainty (i.e., close to a 100 percent chance) that if those persons had sexual intercourse 100 to 200 times, the uninfected person would become infected. Based on the record, there appears to be evidence Hill was infected with the herpes virus before the alleged incidents and C.W. was uninfected with that virus after the alleged incidents. Therefore, had Hill's trial counsel reasonably investigated all possible defenses and obtained expert testimony substantially the same as Ticson's, his counsel would have had a strong, if not compelling, argument that Hill could not have had sexual intercourse with C.W. 100 to 200 times, as C.W. initially alleged, because there is only a very slight possibility she could have remained uninfected with the herpes virus after all of those alleged sexual contacts with Hill, who was infected with the virus. Based on this evidence, his counsel could have more effectively presented her defense theory that C.W. was lying when she made those and other allegations against Hill. Furthermore, Hill's trial counsel could have discredited Davis's expert opinion regarding the chances of transmission of the herpes virus and, in so doing, also indirectly discredited Davis's other expert opinions that constituted a crucial part of the prosecution's case against Hill.

■ Because Hill's trial counsel did not obtain C.W.'s colposcopic photographs and did not make a reasonable attempt to obtain the assistance of an independent medical expert in the field of child molestation (e.g., from Dr. Ticson or another medical expert) to aid her in the investigation and

preparation of possible medical defenses to the charges against Hill, his trial counsel, as Coyne concludes, performed below an objective standard of reasonableness under prevailing professional norms. (*Strickland, supra,* 466 U.S. at pp. 687, 691–692; *People v. Ledesma, supra,* 43 Cal.3d at pp. 215–217; *In re Williams, supra,* 1 Cal.3d at p. 175; *In re Fields, supra,* 51 Cal.3d at p. 1069; *People v. Frierson, supra,* 25 Cal.3d at pp. 160–161; *In re Edward S., supra,* 173 Cal.App.4th at p. 407.)

Hill asserts the case of *Gersten v. Senkowski* (2d Cir. 2005) 426 F.3d 588 is apposite to this case. In *Gersten,* "defense counsel failed to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse. Counsel essentially conceded that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case." (*Id.* at pp. 607–608.) Similar to our conclusion in this case, *Gersten* stated: "As Dr. Brown's affidavit demonstrates, had counsel conducted such an investigation, counsel would likely have discovered that exceptionally qualified medical experts could be found who would testify that the prosecution's physical evidence was not indicative of sexual penetration and provided no corroboration whatsoever of the alleged victim's story. Counsel could thus have presented a strong affirmative case that the charged crime did not occur and the alleged victim's story was incredible in its entirety." (*Id.* at p. 608.)

In *Gersten,* Dr. Brown, the defendant's posttrial medical expert, reviewed the colposcopic photographs of the alleged victim and found they revealed no hymenal clefts, which would have been evidence of vaginal penetration. (*Gersten v. Senkowski, supra,* 426 F.3d at p. 608.) Dr. Brown concluded that the lack of physical evidence of penetration cast serious doubt on the alleged victim's story of daily forcible penetration over a period of years. (*Ibid.*) *Gersten* found "[p]articularly troubling" the defense counsel's failure to examine the colposcopic photographs prior to trial. (*Id.* at p. 609.) *Gersten* concluded that defense counsel performed deficiently by adopting the "weak" defense theory that the prosecution's evidence was consistent with the defendant's innocence without first investigating whether the evidence was not consistent with his guilt. (*Id.* at p. 610.) It concluded defense counsel failed to conduct an adequate pretrial investigation and, in addition, did not make a reasonable strategic decision by foregoing any investigation of the medical evidence. (*Ibid.*) *Gersten* observed: "*In sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel.* [Citations.] This is particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim . . . ." (*Id.* at p. 607, italics added, fn. omitted.) Although *Gersten* is apposite to this case and provides support for our conclusion, we nevertheless

do not rely on it in independently concluding that, based on the record in this case, Hill's counsel performed deficiently in representing him. (Cf. *Michael T. v. Commissioner of Correction* (2010) 122 Conn.App. 416 [999 A.2d 818, 823] ["the petitioner is entitled to a new trial because his trial counsel was ineffective in failing to present expert testimony to challenge the state's expert medical testimony that strongly linked the child's trichomonas to a sexual assault"].)

## III

### Prejudice

Hill asserts his trial counsel's deficient performance was prejudicial and requires reversal of his convictions.

### A

When a defendant meets the initial burden to show his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, then the defendant has the additional burden to show that deficient performance was prejudicial and requires reversal of his or her convictions. (*Strickland, supra,* 466 U.S. at pp. 687, 691–692; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216–217; *People v. Pope, supra,* 23 Cal.3d at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693–694; *Ledesma,* at pp. 217–218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland,* at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams, supra,* 16 Cal.4th at p. 215.)

### B

Based on our review of the entire record and the three declarations submitted by Hill with his petition, we conclude it is reasonably probable Hill would have obtained a more favorable result at trial had his counsel not performed deficiently. Hill's trial counsel had the primary, if not sole, defense strategy of discrediting C.W.'s and N.T.'s molestation allegations against Hill, while supporting C.W.'s recantation of her allegations at trial. However, his trial counsel did not obtain C.W.'s colposcopic photographs or the assistance of an independent medical expert who could have provided her with another,

and likely stronger, defense theory that Hill never had sexual intercourse with C.W. and certainly did not have sexual intercourse with her 100 to 200 times over a two-year period. Based on the absence of any findings and the normal appearance of C.W.'s hymen during her forensic examination, a defense medical expert, like Ticson, apparently would have testified that C.W. did not have the physical changes to her hymen that would be expected had she had sexual intercourse with Hill 100 to 200 times. Furthermore, a defense medical expert, like Ticson, apparently would have testified that because C.W. remained uninfected with the herpes virus, it was almost a statistical certainty that C.W. did not have sexual intercourse with Hill 100 to 200 times as she originally alleged. That medical expert testimony would have discredited C.W.'s initial allegations against Hill and, instead, would have provided substantial support for her trial testimony stating Hill never raped her or touched her inappropriately.

Likewise, consultation with, and trial testimony by, a defense medical expert, like Ticson, clearly would have allowed Hill's trial counsel to more effectively cross-examine and discredit Davis, the prosecution's medical expert. Because this case was, to a large extent, a credibility contest involving Hill, C.W. and N.T., the testimony of Davis, the sole medical expert who testified at trial, played an important part in the jury's deliberations. That crucial role is shown by the fact that during its deliberations the jury requested, and received, a "readback" of Davis's expert testimony. One day later, the jury returned its verdict finding Hill guilty of 23 offenses. We believe it is reasonably probable that had the jury heard defense medical expert testimony substantially as proffered by Ticson, the jury would have had a reasonable doubt respecting Hill's guilt on one or more of the 23 counts on which he was convicted. (*Strickland, supra,* 466 U.S. at p. 695.) The jury would likely have found less credible C.W.'s initial allegations against Hill and more credible her trial testimony that Hill never raped her or touched her inappropriately.

Although defense medical expert testimony presumably would have directly affected only C.W.'s allegations against Hill, there likely would have been a "spillover" effect regarding the jury's consideration of N.T.'s allegations against Hill. The jury's finding that C.W.'s initial, more serious allegations against Hill were credible likely had a substantial impact on its determination that N.T.'s initial allegations and trial testimony against Hill were also credible. Had Hill's trial counsel presented defense medical expert testimony substantially as Ticson proffers and cross-examined Davis more effectively, it is likely the entire prosecution case, including the charges against Hill involving N.T., would have been substantially weakened and the jury may have had a reasonable doubt regarding Hill's guilt of one or more of the counts involving N.T. We conclude all of Hill's convictions must be reversed whether they involved C.W. or N.T.

In conclusion, it is reasonably probable Hill would have obtained a more favorable result had his trial counsel not performed deficiently. (*Strickland, supra,* 466 U.S. at p. 695.) Alternatively stated, based on our review of the entire record and the declarations submitted by Hill in support of his petition, our confidence in the outcome of his trial has been undermined. (*People v. Williams, supra,* 16 Cal.4th at p. 215.) Hill was denied his right to effective assistance of counsel guaranteed by the federal and state Constitutions. Hill is entitled to the habeas corpus relief he seeks, namely to have the judgment set aside in its entirety. The People remain free to retry Hill on the counts that we reverse. (*In re Neely* (1993) 6 Cal.4th 901, 922 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

## DISPOSITION

The relief requested in the petition for writ of habeas corpus is granted. The judgment is vacated in its entirety.

Benke, Acting P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied August 26, 2011, and respondent's petition for review by the Supreme Court was denied December 14, 2011, S196558. Baxter, J., and Corrigan, J., were of the opinion that the petition should be granted.