Filed 3/30/15  P. v. Brace CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GEORGE ALDEN BRACE,<br><br>    Defendant and Appellant. | H040271<br>(Santa Clara County<br>Super. Ct. No. C1242970) |

## I.    INTRODUCTION

Defendant George Alden Brace appeals after a jury convicted him of receiving stolen property (Pen. Code, § 496, subd. (a))[1] and possession for sale of a controlled substance (Health & Saf. Code, § 11378).  The trial court found true allegations that defendant had served two prior prison terms (§ 667.5, subd. (b)) and had a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).  Defendant was sentenced to a prison term of six years four months.

On appeal, defendant contends his trial counsel was ineffective for failing to retain an expert in drug possession and sales, claiming that expert testimony would have supported the defense theory that defendant was only guilty of simple possession, not

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

possession for sale. We find no merit to this claim, and we will therefore affirm the judgment.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## II.     BACKGROUND

### A.     *Evidence Relating to Receiving Stolen Property Charge*

In October of 2012, Rebecca Maxim lived in a mobile home on Lisa Lane in San Jose. Two roommates paid rent to Maxim: Chris Johnson and Raymundo Hernandez. For about two months, defendant had also been staying there, "on and off." At some point, Maxim had seen one of defendant's bank statements, which showed that he had received $78,000 on September 7, 2012. Although defendant did not pay rent to Maxim, at some point in October of 2012, defendant had given Maxim some money.

Maxim had been collecting Barbie dolls for 26 years. She owned about 60 Barbie dolls, all in their original packaging and in mint condition. The dolls were valued at $70 to $1,000 each. In October of 2012, Maxim needed money and therefore decided to sell the dolls. She did an inventory of the dolls in preparation for selling them, and discovered that some were missing.

On October 13, 2012, Maxim called the police and provided them with a list of the missing dolls. Police subsequently recovered five of the missing dolls from a storage locker rented by defendant.

### B.     *Evidence Relating to Possession For Sale Charge*

San Jose Police Officer Gary Petrakovitz contacted defendant at Maxim's residence on October 13, 2012. Defendant's speech was rapid, indicating he was either nervous or under the influence. Officer Petrakovitz observed defendant's eyelids flutter when defendant closed his eyes, which suggested defendant was under the influence.

2

Officer Petrakovitz searched defendant's vehicle, which was parked in the carport of Maxim's residence with the driver's window down and the doors unlocked. In a pocket in the driver's side door, Officer Petrakovitz found three Ziplock baggies containing a white crystalline substance. One of the baggies was blue; the second had "some red and some yellow on it;" and the third was "clear with a little black [Batman] design on it." In the back seat of defendant's vehicle, Officer Petrakovitz found a plastic container, which contained four more baggies containing the same substance. There were also 16 clean, unused baggies in the container.

Officer Petrakovitz arrested defendant. He found a little over $500 in cash on defendant, but he allowed defendant to keep the money because he did not know if it was "obtained legally or not." Defendant had provided evidence that he had a bank account with money in it.

A criminalist tested the baggies containing the white substance and determined the substance was methamphetamine. The criminalist weighed the methamphetamine from one of the baggies; it weighed 0.99 grams. The gross weight of the other six baggies was 5.84 grams.

Officer Petrakovitz believed defendant was involved in narcotics sales. In his experience, most users would have only one or two baggies and a small quantity, such as one-quarter of a gram. Not many methamphetamine users have "the discipline or desire" to hold onto large quantities of methamphetamine. It is hard to obtain methamphetamine and thus users generally smoke what they have. However, Officer Petrakovitz acknowledged that most sellers are also users.

According to Officer Petrakovitz, the best evidence of possession for sale is an actual sale. Other indicia of possession for sale include the quantity, the packaging method, the presence of extra packaging material, possession of a large amount of cash, and possession of a scale.

Santa Clara Police Officer Travis Niesen was an expert in "possessing narcotics for sale." In determining whether methamphetamine is possessed for sale, he looks at the totality of the circumstances. Indicia of sales include pay-owe sheets, empty baggies, and cash. It is not common for users to have empty baggies, but it is very common for sellers.

Officer Niesen was given a hypothetical scenario: a vehicle with seven baggies of methamphetamine and a container of 15 unused baggies. He would consider that a narcotics sales case, because it is not common for a user to have seven individual baggies, but it would be common for a seller. The presence of $500 cash on hand would also indicate the methamphetamine was possessed for sale: the person might be on his or her way to make a large purchase, or the person might have just made some sales.

Officer Niesen had seen dealers who had baggies of methamphetamine in different areas of a car. A person might put the baggies in different places to make it harder to find, or simply because the person is disorganized.

Officer Niesen agreed that a methamphetamine user could carry small plastic bags and that it was possible the methamphetamine was owned by more than one person. He would not think it was significant if the methamphetamine was packaged in different amounts. The individual packaging was the more important factor. He agreed it was possible that methamphetamine packaged in different size and different color baggies came from different sources.

### C. *Defense Evidence*

Johnson, one of Maxim's roommates, testified that Maxim had feelings toward defendant in October of 2012. Defendant did not reciprocate those feelings, and Maxim had become upset the night before defendant's arrest, because defendant had brought a female friend over.

Defendant testified he had received two large lump sum settlements for back pay within the year before his arrest: he had received $74,000 in July or August of 2012, and

4

he had received $34,000 in December of 2011. He also received almost $3,000 per month from the government.

Defendant testified that he had purchased the Barbie dolls found in his storage unit from a woman who rented the storage unit next to his. He wanted to help the woman out financially, and he thought the dolls would make a "cool" present for his niece. It was a coincidence that the dolls were the same as some of the dolls missing from Maxim's collection.

Defendant admitted that he had been under the influence of methamphetamine at the time his car was searched. He also admitted that the methamphetamine found in his car belonged to him, but he denied intending to sell it. He had enough money that he did not have to buy just a little methamphetamine at a time. When he found some methamphetamine that was "okay," he would say, "how much you got, give me all of it." He kept some of the methamphetamine in a container as a means of rationing it, so it would last longer and be less dangerous. If he did not do so, he would not have enough self-control to keep from using it all up.

Defendant explained that he had not purchased all seven baggies of methamphetamine at the same time. He had purchased three or four baggies from one person, the blue baggie from another person, the baggie with the Batman design from another person, and another baggie from yet another person.

Defendant explained that he had $508 in cash on him at the time of his arrest because he had just withdrawn $500 from an ATM machine. He had withdrawn the money because he was going to visit his girlfriend in Sacramento. He claimed the ATM receipt was in his property at the time of his arrest.

### D. Charges, Verdicts, and Sentence

Defendant was charged with receiving stolen property (§ 496, subd. (a)) and possession for sale of a controlled substance (Health & Saf. Code, § 11378). The

information alleged that defendant had served two prior prison terms (§ 667.5, subd. (b)) and had a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).

The jury convicted defendant of both charged offenses. Defendant admitted the prior conviction allegations. The trial court sentenced him to a prison term of six years four months.

## III.  DISCUSSION

Defendant contends his trial counsel was ineffective for failing to retain an expert in drug possession and sales, claiming that expert testimony would have supported the defense theory that defendant was only guilty of simple possession, not possession for sale.

### A.  *Standards for Ineffective Assistance of Counsel Claims*

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.]  Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.]  If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.]  If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*); see *Strickland v. Washington* (1984) 466 U.S. 668.)

6

"Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant. [Citation.]" (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016-1017 (*Hill*).) A defendant can " 'reasonably expect that in the course of representation his [or her] counsel will undertake only those actions that a reasonably competent attorney would undertake,' " and that " 'before counsel undertakes to act at all he [or she] will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.]' " (*Id.* at p. 1016.)

### B.    Analysis

Defendant notes that failure to consult an expert witness may constitute ineffective assistance of counsel. He discusses *Hill, supra,* 198 Cal.App.4th 1008, in which the appellate court granted habeas relief after determining that the defendant's trial counsel had rendered ineffective assistance by failing to retain a medical expert in a child molestation case. In contrast to *Hill,* where the defendant presented supporting declarations in a habeas petition—including a declaration from a possible medical expert—here, nothing in the appellate record shows that defendant's trial attorney "*could have* presented any *favorable* expert testimony." (*People v. Datt* (2010) 185 Cal.App.4th 942, 952; see also *People v. Bolin* (1998) 18 Cal.4th 297, 334 ["The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard . . . ."].)

Even assuming that favorable expert testimony was available, defendant has not shown that the decision not to call an expert at trial was not rational or informed. Defendant's trial counsel may have determined that he could effectively cross-examine the prosecution's expert and the arresting officer and make an effective argument to the jury based on the evidence at trial. While "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence," there are " 'countless ways to provide effective assistance in any given case. . . .' [Citation.] Rare are the situations in which the 'wide

7

latitude counsel must have in making tactical decisions' will be limited to any one technique or approach. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 106 (*Richter*).) "In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." (*Id.* at p. 111.)

In the instant case, the appellate record shows that defendant's trial counsel was effective in utilizing cross-examination to elicit weaknesses in the prosecution's case and create reasonable doubt for the jury. (See *Richter, supra,* 562 U.S. at p. 111 ["defense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions"].)

First, during his cross-examination of Maxim, defendant's trial counsel elicited the fact that a month before defendant's arrest, in September of 2012, defendant had received $78,000—a fact that tended to show defendant did not need to sell methamphetamine for money and that defendant could have afforded to buy seven individual baggies of methamphetamine for himself. Defendant's trial counsel also elicited from Maxim the fact that defendant frequently used methamphetamine, to show that defendant was only a user, not a seller.

Defendant's trial counsel also effectively cross-examined Officer Petrakovitz, who had testified that not many methamphetamine users have "the discipline or desire" to hold onto large quantities of methamphetamine. Defendant's trial counsel pointed out that Officer Petrakovitz had also testified that methamphetamine sellers are also generally methamphetamine users, and that his testimony was therefore self-contradictory. Defendant's trial counsel further elicited from Officer Petrakovitz the fact that the officer had allowed defendant to keep the over $500 in cash that defendant had in his possession because defendant had provided proof he had a bank account with money in it. Finally,

8

through cross-examination, Officer Petrakovitz acknowledged that no measuring device was found with defendant and that methamphetamine users often carry Ziplock baggies.

During cross-examination of the prosecution's expert, Officer Niesen, defendant's trial counsel elicited the fact that no pay-owe sheets or measuring devices—both common indicia of sales—were found. He elicited Officer Niesen's admission that a user could carry small baggies to keep his or her methamphetamine in. Officer Niesen also admitted that different sizes and colors of baggies can indicate that methamphetamine came from difference sources.

Defendant's trial counsel also put on affirmative defense evidence. He put defendant on the stand and elicited defendant's testimony that he possessed the methamphetamine for personal use, not for sale. Defendant's trial counsel further elicited evidence regarding defendant's income and defendant's assets.

Finally, during argument to the jury, defendant's trial counsel emphasized the contradictions in Officer Petrakovitz's testimony, questioned whether a methamphetamine seller would leave methamphetamine in an unlocked car with the window down, noted that the prosecution failed to introduce any evidence as to the weight of the methamphetamine in six of the seven baggies, and argued that the different colors and sizes of packaging showed that defendant had purchased small amounts of methamphetamine from various sellers for personal use.

In sum, on this record, defendant has failed to overcome the presumption that " ' "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions [were] a matter of sound trial strategy." ' " (*Lopez, supra,* 42 Cal.4th at p. 966.) We therefore conclude defendant has not established that his trial counsel was ineffective.

## IV.   DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:




_____
MIHARA, J.




_____
GROVER, J.