Filed 4/9/15  P. v. Durnin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS CHARLES DURNIN,<br><br>    Defendant and Appellant. | D066961<br><br><br><br>(Super. Ct. No. SWF1100682) |

APPEAL from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Affirmed with directions.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Thomas Charles Durnin guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1); evading a pursuing peace officer

and causing the death of another (Veh. Code, § 2800.3; count 2); possession of a short-barreled shotgun (Pen. Code, former § 12020, subd. (a); count 4); and being a felon in possession of a firearm (Pen. Code, former § 12021, subd. (a); count 5).[1]  The court sentenced defendant on count 1 to an indeterminate term of 15 years to life in state prison.  On count 2, the court imposed a 10-year term but stayed the sentence pursuant to Penal Code section 654, subdivision (a).  The court also imposed, pursuant to a plea bargain, a three-year term for a robbery charge in a separate case; added an eight-month consecutive sentence on count 4; and ordered the midterm sentence on count 5 stayed under Penal Code[2] section 654, subdivision (a).

On appeal, defendant contends the court erred when it admitted into evidence a video of him pleading guilty in Arizona to a charge of "felony endangerment."  In February 2008, defendant fled at a high rate of speed, ran a red light and crashed shortly thereafter into a traffic sign and fire hydrant after a fully-uniformed police officer riding on his police motorcycle activated his lights and attempted to pull over defendant's vehicle for a traffic violation.  Although defendant admits the relevance of the video evidence, he nonetheless contends this evidence violated his constitutional rights and/or should have been excluded under Evidence Code section 352 because it showed him wearing jail attire while entering the plea.

Defendant also contends that the evidence in the record is insufficient to support his conviction on count 2; that the court erred in failing sua sponte to give a limiting

---

[1]    The court dismissed count 3—possession of an assault weapon (former § 12280, subd. (b))—at the conclusion of the presentation of evidence.

[2]    All further statutory references are to the Penal Code unless noted otherwise.

2

instruction in connection with his Arizona guilty plea; that the court erred in refusing to give the jury his proposed pinpoint instruction on the issue of implied malice; and that the abstract of judgment should be corrected to show the trial court stayed under section 654, subdivision (a) the sentence on count 5.

As we explain, we conclude the abstract of judgment should be corrected with respect to count 5. Otherwise, we affirm the judgment of conviction.

FACTUAL OVERVIEW[3]

Beaumont Police Officer Brian Stehli testified he was monitoring traffic in mid-March 2011 while parked on or near Beaumont Avenue. Around 11:00 a.m., Officer Stehli saw a silver pickup truck drive past with a large crack in its front windshield. As it went by, Officer Stehli also noticed a crack in the pickup's right brake lens cover. Officer Stehli pulled into traffic in his fully-marked Beaumont police cruiser in order to conduct a traffic stop of the pickup in what Officer Stehli presumed would be a "fix-it ticket."

In addition to lights and a siren, Officer Stehli's cruiser was equipped with a recording system that is always on and records data and captures video from a camera mounted on the cruiser's dashboard. On the day in question, the camera was operational. The video, which was shown to the jury and is included in the record as exhibit 1, showed Officer Stehli pulling behind the stopped pickup at an intersection. After notifying dispatch of his intent to make the stop, Officer Stehli activated his cruiser's

---

[3]  We view the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to certain of defendant's contentions are discussed *post*.

lights and siren in an attempt to pull over the pickup. The driver of the pickup, later identified as defendant, did not stop but instead accelerated westbound.

With Officer Stehli in pursuit, the driver of the pickup went through several stop signs and crossed a double yellow line into oncoming traffic in order to pass another vehicle. The video next showed Officer Stehli pursuing the pickup as it traveled on a dirt road that ran parallel to and eventually intersected Highway 79. As the pursuit continued, the driver of the pickup went through a red light at a speed estimated by Officer Stehli to be between 70 and 90 miles per hour.

Once on Highway 79, the video showed the driver of the pickup passing a vehicle on the right shoulder of the road. The video also showed other drivers yielding as Officer Stehli pursed the pickup. After exiting Highway 79, the driver of the pickup truck ran through another stop sign and made a left turn from the right turn lane. The driver next crossed a double yellow line again and drove into oncoming traffic in order to pass another vehicle.

As the chase continued, Officer Stehli slowed down and, at one point, lost sight of the pickup because the driver was swerving in and out of oncoming traffic and Officer Stehli did not want to put the public at further risk. The driver of the pickup next turned onto a road that led to the Soboba Indian Reservation. Officer Stehli testified, and the video showed, a large cloud of dust on the horizon. Just seconds before he saw the dust cloud, however, Officer Stehli testified he had decided to terminate the pursuit of the pickup because they were approaching a casino where there tended to be a lot of pedestrian and vehicle traffic.

4

As Officer Stehli approached the dust cloud, he saw that the pickup he had been pursuing had collided head on with a white Cadillac and that both vehicles were stopped on the shoulder on the left side of the road. Officer Stehli testified when he approached the pickup he saw defendant in the driver's seat.

Beaumont Corporal Scott Davis testified he was in route to assist Officer Stehli when he came upon the accident scene and saw Officer Stehli standing outside his cruiser, with his duty weapon pointed in the direction of the pickup. Corporal Davis could see at least two individuals in the pickup.

When Corporal Davis and other officers approached the pickup, they saw three individuals inside, with defendant sitting in the driver's seat. Inside the white Cadillac, Corporal Davis saw an individual in a "laid-back position" in the driver seat. The driver of the Cadillac was then alive but unconscious and unresponsive. A subsequent autopsy of the driver of the Cadillac, victim Mike Morgan, showed the victim died of "multiple blunt force trauma" that was consistent with injuries sustained in an automobile collision.

While at the accident scene, California Highway Patrol (CHP) advised Corporal Davis that witnesses had seen weapons being thrown from the pickup during the pursuit. Corporal Davis doubled-back along the chase route, and, about a half-mile from the accident scene, he came upon a CHP officer stopped on the side of the road. There, Corporal Davis recovered a loaded sawed-off shotgun with a pistol grip and an assault rifle with a high-capacity, loaded magazine attached.

On the day of the accident, witness "'Art Moronez was driving eastbound on Soboba Road heading towards the Soboba Casino. He was behind a couple of cars also heading towards the casino. Mr. Moronez saw the . . . pickup passing him on his left side

5

in the oncoming traffic lane going about twice as fast. The white Cadillac was coming westbound from the other direction, and it swerved to its right towards the north shoulder. The . . . pickup swerved to its left towards the north shoulder. The two vehicles hit head-on. The collision was in the nature of an explosion with debris flying everywhere."[4]

"'Detective Chris Ramos found a cell phone inside the [pickup]. The contents of the cell phone included digital photographs of the firearms recovered by Corporal Scott Davis.'" "'The guns recovered by Corporal Scott Davis . . . were guns thrown from the [pickup] during the course of the pursuit.'"[5]

CHP Investigator Justin Snider testified that he reviewed the video footage from the dashboard camera of Officer Stehli's cruiser and considered other evidence, including photographs and tire marks; he also visited the accident scene. Investigator Snider opined that the pickup and Cadillac were involved in a head-on collision; that the collision occurred because defendant was driving the pickup into oncoming traffic; and that, shortly before the accident, the defendant and the driver of the white Cadillac both attempted to avoid the collision by turning toward the north shoulder of the road. Investigator Snider thus opined that the primary cause of the collision was defendant's driving in the wrong lane of traffic.

---

[4] This evidence was read into the record by stipulation of the parties.

[5] See footnote 4, *ante*.

6

## DISCUSSION

## I

### Admission of Video Evidence of Defendant's Guilty Plea

A. *Additional Background*

Chandler City Police Officer John Allison testified about an incident involving defendant that took place in Arizona in February 2008.  While conducting routine traffic enforcement on his fully-marked police motorcycle while wearing his police uniform and a badge, Officer Allison heard a sound that was "consistent with tires locked and skidding on asphalt roadway."  Officer Allison saw a blue-colored vehicle stopped in an intersection that he determined had failed to yield to oncoming traffic.

As the blue-colored vehicle drove past, Officer Allison pulled directly behind it, activated his lights and siren and attempted to stop the vehicle.  The blue-colored vehicle did not stop, however, but continued to travel at a constant rate of speed.  As Officer Allison followed the vehicle, he made eye contact several times with the driver of the vehicle through the vehicle's rearview mirror.  Officer Allison identified defendant as the driver of the blue-colored vehicle.  At some point, the driver of the blue-colored vehicle pulled into a convenience store parking lot and stopped.  After altering dispatch of the need for backup, Officer Allison sat on his motorcycle directly behind the vehicle.

After a few seconds, Officer Allison dismounted his motorcycle and took a few steps toward the vehicle.  Officer Allison testified that as he approached the vehicle, he had a "clear[]" visual of the face of its driver, who he again identified as defendant.  The driver of the blue-colored vehicle in response accelerated suddenly and headed westbound.  Officer Allison watched the vehicle go through a red light at an intersection

7

without slowing, narrowly missing other vehicles that had entered the intersection on a green light.

Officer Allison got back on his motorcycle and followed the blue-colored vehicle, which he estimated was traveling at a high rate of speed, perhaps 100 miles per hour. Because the blue-colored vehicle was going so fast and was about a quarter-mile ahead of him, Officer Allison advised dispatch he was discontinuing the pursuit. A short time later, as Officer Allison was heading to the police station, dispatch notified him of a single-vehicle accident close to his location. Dispatch's description of the vehicle matched the vehicle Officer Allison had been pursing.

At the accident scene, Officer Allison saw the same blue-colored vehicle he had been pursuing stopped on top of a sidewalk. The vehicle had sustained significant front-end damage after it hit a permanently-affixed traffic control sign and sheared a fire hydrant off its base. Based on the skid marks, Officer Allison determined the vehicle was going too fast when the driver attempted to make a turn.

The record shows outside the presence of the jury, the court addressed whether defendant's guilty plea and conviction in Arizona would be admissible in evidence. During the hearing, the People noted witnesses reported seeing the driver of the blue-colored vehicle, the defendant, running from the scene with a gun in his hand. Although the police never recovered the gun, inside the vehicle they found "ammunition all over the floor." The People argued the evidence was relevant in the instant case to show "implied malice"; that is, to show that running from police and driving in such a manner supported the inference that the defendant in the instant case had a "subjective understanding" of the dangerousness of this type of situation.

8

The court noted there was a video of defendant pleading guilty to the offense of "felony endangerment." The People noted that defendant in the video acknowledged that "what he did endangered the motoring public with an imminent risk of death."

The defense argued the guilty plea in the Arizona case was not relevant on the issue of malice, which required a showing of subjective awareness by the actor. As relevant here, the defense also briefly argued the court should exclude the video under Evidence Code section 352 because it showed defendant pleading guilty in "jail garb."

The court ruled the gun, or "missing gun," and the ammunition found in the blue-colored vehicle were inadmissible. With respect to the guilty plea and factual basis for the plea, the court then reserved ruling on whether the video itself was admissible but decided the evidence was otherwise admissible on the issue of malice. In so doing, the court noted it was not admitting such evidence under Evidence Code section 1101.

The record shows the court subsequently reviewed the video (i.e., exhibit 1) and a transcript of the video and found the video admissible. In reaching its decision, the court noted: "This whole plea and prior occasion [from Arizona] is relevant to the extent that it makes an impression on the defendant as to the seriousness and dangerousness of the conduct that he engaged in back in Arizona. And seeing the Court proceedings and seeing the formality of the situation or the lack of formality is all relevant to determine -- that the jury has to make the determination whether or not going through that whole exercise did indeed make an impression on the defendant to raise his subjective awareness about the seriousness of the conduct and dangerousness of the conduct. [¶] And, therefore, actually seeing him in court in jail garb, I think, is relevant to whether or

9

not it did have an effect on his subject awareness.  And, therefore, I think it's relevant that they see it as well as hear it."

B.  *Implied Malice*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  "[M]alice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life.  [Citations.]"  (*People v. Watson* (1981) 30 Cal.3d 290, 296, italics omitted (*Watson*) [affirming second degree murder conviction arising out of a high-speed, head-on automobile collision by a drunk driver that left two people dead].)  In *Watson*, our Supreme Court "created [a] theory for prosecuting vehicular homicide as second degree murder in cases involving implied malice.  [Citation.]"  (*People v. Doyle* (2013) 220 Cal.App.4th 1251, 1266, fn. 4.)  The *Watson* court reasoned:  "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.  [Citation.]"  (*Watson*, *supra*, 30 Cal.3d at pp. 296–297.)  Accordingly, when the driver's conduct in a vehicular homicide case "can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied.  [Citation.]  In such cases, a murder charge is appropriate."  (*Id.* at p. 298; see *People v. Ortiz* (2003) 109 Cal.App.4th 104, 109–110.)

Here, using CALCRIM No. 520, as modified,[6] the court instructed the jury in part that to prove murder, the People must prove among other things that defendant "acted

---

6    CALCRIM No. 520, as modified, provides: "The defendant is charged in Count One with Second Degree Murder in violation of Penal Code section 187. [¶] To prove

with implied malice." The court further instructed that defendant acted with implied malice if, "[a]t the time he acted, he knew his act was dangerous to human life" and if he "deliberately acted with conscious disregard for human life."

Defendant wisely does not contend that his Arizona guilty plea and conviction were irrelevant and inadmissible in the instant case on the issue of implied malice. Indeed, the evidence in the record shows that in February 2008, defendant reached speeds of perhaps 100 miles per hour while driving on city streets in Maricopa County, Arizona, while being pursued by Officer Allison; that Officer Allison, who was on a police motorcycle, discontinued the chase for safety reasons; that defendant drove through a red light and nearly hit other vehicles who had the right-of-way in order to evade police; and that defendant ultimately crashed his vehicle into a sign post and fire hydrant, and ended up on a sidewalk, after he was unable to complete a turn given his high rate of speed.

---

that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] [AND] [¶] 2. When the defendant acted, he had a state of mind called implied malice aforethought. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Implied malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

11

What's more, the video of the court proceedings that took place in late December 2009—just about 14 months before the fatal accident here—shows defendant pleading guilty to felony endangerment and admitting he "placed others on the road in imminent risk of death by driving erratically while trying to flee from police." Clearly, defendant's guilty plea and conviction, and the video showing him pleading guilty and admitting he placed others in "imminent risk of death" in attempting to evade police, were relevant here on the issue of whether defendant subjectively appreciated that his conduct was dangerous to human life when he evaded police for almost 13 miles by driving at a high rate of speed through multiple stop signs, red lights and into oncoming traffic. (See *Watson*, *supra*, 30 Cal.3d at pp. 296–297.)

C. *Presumption of Innocence, Evidence Code Section 352 and "Jail Garb"*

Despite pleading guilty to felony endangerment in Arizona and despite the relevancy of that plea on the issue of implied malice, defendant nevertheless contends the court erred when it admitted the video of his guilty plea because that video showed him wearing "jail garb." In making this contention, defendant relies on a line of cases holding that requiring a defendant to wear jail clothing during trial violates a defendant's constitutional rights to a fair trial, due process and equal protection because doing so "creates an unacceptable risk of undermining the presumption of innocence in the jury's eyes." (*People v. Meredith* (2009) 174 Cal.App.4th 1257, 1262, citing *Estelle v. Williams* (1976) 425 U.S. 501, 503-505 (*Estelle*); *People v. Taylor* (1982) 31 Cal.3d 488, 494-495 (*Taylor*).)

"There are substantial reasons for the rule that a criminal defendant is entitled to be tried in ordinary clothing. Foremost is the rationale that compelling a defendant to go

12

to trial in jail clothing could impair the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt.  (*Estelle*[,] *supra*, 425 U.S. at p. 504 [other citations omitted].)  To implement and protect the presumption of innocence, 'courts must be alert to factors that may undermine the fairness of the factfinding process.' (*Estelle*, *supra*, 425 U.S. at p. 503.)  The Supreme Court has observed that the defendant's jail clothing is a constant reminder to the jury that the defendant is in custody, and tends to undercut the presumption of innocence by creating an unacceptable risk that the jury will impermissibly consider this factor.  (425 U.S. at pp. 504–505.)  The clothing inexorably leads to speculation about the reason for defendant's custody status, which distracts the jury from attention to permissible factors relating to guilt.  In most instances, parading the defendant before the jury in prison garb only serves to brand the defendant as someone less worthy of respect and credibility than others in the courtroom.  'The prejudice may only be subtle and jurors may not even be conscious of its deadly impact, but in a system in which every person is presumed innocent until proved guilty beyond a reasonable doubt, the Due Process Clause forbids toleration of the risk.  Jurors required by the presumption of innocence to accept the accused as a peer, an individual like themselves who is innocent until proved guilty, may well see in an accused garbed in prison attire an obviously guilty person to be recommitted by them to the place where his clothes clearly show he belongs.' (*Estelle*[,] *supra*, 425 U.S. at pp. 518–519 (dis. opn. of Brennan, J.).)

"Another reason for disfavoring the use of prison clothes during trial was articulated in *People v. Zapata* (1963) 220 Cal.App.2d 903.  That court recognized that beside the potential prejudice raised in the minds of the jurors, the defendant may be

13

handicapped in presenting his defense by the embarrassment associated with his wearing jail garb." (*Taylor*, *supra*, 31 Cal.3d at pp. 494–495.)

We conclude neither reason for the prison-garb rule applies to the case at bar because the record shows defendant wore "civilian clothes" during the trial in the instant case and because the defendant was seen wearing jail clothes in the video *while he was pleading guilty for felony endangerment.* Thus, there clearly was no risk of undermining the presumption of innocence in connection with either the instant case or the Arizona case.

We likewise reject defendant's contention the court abused its discretion when it failed to exclude the video under Evidence Code section 352. This statute provides a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Here, we conclude the court properly exercised its discretion in admitting under Evidence Code section 352 the video of the Arizona proceeding showing defendant in jail clothes pleading guilty to felony endangerment. As noted *ante*, such evidence was highly relevant to the issue of implied malice and, in particular, defendant's subjective understanding of the dangerousness of driving recklessly while evading police. In addition, such probative evidence was not "substantially outweighed" by any potential prejudice, given, as also noted *ante*, that defendant in the video was pleading *guilty* to felony endangerment. We thus reject defendant's contention the court abused its discretion and erred in admitting the video of his late-December 2009 guilty plea in

14

Arizona.  (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [noting the "prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence," but rather the ""prejudice" referred to in [this statute] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues'"]; see also *People v. Thomas* (2011) 51 Cal.4th 449, 485 [noting a court of review will not disturb a court's exercise of discretion to admit or exclude evidence under Evidence Code section 352 unless the court manifestly abused its discretion and the abuse resulted in a miscarriage of justice].)

II

Sufficiency of the Evidence on Count 2

Defendant contends there is insufficient evidence to support his conviction on count 2 for evading a pursuing police officer and causing the death of victim Morgan. Specifically, he contends the evidence is insufficient to show for purposes of Vehicle Code section 2800.3, subdivision (b) that: 1) he was being actively pursued by a police officer when he collided with and killed victim Morgan; 2) he saw or reasonably should have seen the lighted red lights on the police cruiser driven by Officer Stehli in pursuit; and 3) his attempts to evade Officer Stehli proximately caused the fatal accident.

A.  *Guiding Principles*

Subdivision (b) of Vehicle Code section 2800.3 provides: "Whenever willful flight or attempt to elude a pursuing peace officer in violation of Section 2800.1 proximately causes death to a person, the person driving the pursued vehicle, upon conviction, shall be punished by imprisonment in the state prison for a term of 4, 6, or 10 years."  Vehicle

15

Code section 2800.1, subdivision (a) provides: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor punishable by imprisonment in a county jail for not more than one year if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, and that peace officer is wearing a distinctive uniform."

Here, there is substantial evidence in the record to support the finding that defendant was in violation of Vehicle Code section 2800.1, subdivision (a), inasmuch as Officer Stehli testified, and the video recording from his dashboard camera shows, that Officer Stehli turned on his police cruiser's red lights and siren in order to make a stop of the pickup being driven by defendant; that his police cruiser was distinctly marked from the front fender to the back fender with City of Beaumont police emblems; and that Officer Stehli was wearing a distinctive police uniform and was a peace officer within the meaning of the law. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 [noting that in assessing a claim of sufficiency of the evidence, a court "'"'"must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of

16

solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt"'"'"].)

That defendant contends there was insufficient evidence to prove he saw, or a reasonable person should have seen, Officer Stehli's police lights for purposes of Vehicle Code section 2800.1 would require us to ignore the evidence in the record, and the reasonable inferences to be drawn from such evidence. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1069-1070 [noting substantial evidence includes circumstantial evidence and any reasonable inferences that can be drawn therefrom].) Such evidence includes the testimony of Officer Stehli that he turned on the lights of his police cruiser and activated his siren when he attempted to pull over the pickup being driven by defendant, as further supported by the video from Officer Stehli's dashboard camera. Such inferences include the fact that, after Officer Stehli activated his cruiser's police lights and siren, defendant *immediately* sped off in his pickup. (See *People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*) [noting that in conducting a substantial evidence review, a court of review neither resolves credibility issues nor evidentiary conflicts].) We thus reject defendant's contention the evidence was insufficient to show he, or a reasonable person in his position, allegedly did not see the police lights Officer Stehli activated when he sought to pull over the pickup being driven by defendant.

We also reject defendant's contention that the evidence was insufficient to show Officer Stehli was not "pursuing" him for purposes of Vehicle Code section 2800.3 when defendant's pickup collided head on with victim Morgan's Cadillac. Viewing the evidence in the record in the light most favorable to the judgment (see *People v. Johnson*

17

(1980) 26 Cal.3d 557, 578), we conclude it supports the finding that the collision occurred while Officer Stehli was pursuing defendant.

Indeed, as noted, the record shows that Officer Stehli pursued defendant for almost 13 miles, as defendant drove through multiple stop signs and red traffic signals; that as defendant approached the casino located on the Soboba Indian Reservation, Officer Stehli slowed down and, at one point, lost sight of the pickup because Officer Stehli did not want to put the public at further risk, particularly in light of the fact defendant was driving his pickup in and out of oncoming traffic and because Officer Stehli knew the area well and knew it typically had a lot of pedestrian and vehicle traffic; that even though Officer Stehli slowed down, he continued to travel in the same direction as the pickup; that just seconds after slowing down, he saw a "dust cloud" ahead suggesting there had been some sort of accident involving the pickup; and that just before he saw the dust cloud, Officer Stehli had "reduced" the lights on his police cruiser but nonetheless continued to use the cruiser's alternating red and blue lights.

That there is evidence in the record Officer Stehli, moments before the crash, had told dispatch he was calling off the pursuit does not change our conclusion in this case, particularly given the evidence summarized above. At most, such evidence created a mere evidentiary conflict that the jury resolved against defendant. (See *Maury*, *supra*, 30 Cal.4th at p. 403.) In any event, we note from the record that defendant himself still believed he was being pursued by police at the time of the collision with victim Morgan, inasmuch as defendant—at the time of the collision—had crossed over a double yellow line into oncoming traffic to escape the police. We thus reject his contention that the

18

evidence in the record was insufficient to show he was being "pursued" at the time of the collision for purposes of Vehicle Code section 2800.3, subdivision (b).

We further conclude this same evidence supports the finding of the jury that defendant's attempt to flee from and/or elude police was the proximate cause of victim Morgan's death.

What's more, after reviewing among other evidence the video from Officer Stehli's dashboard camera, CHP Investigator Snider opined that the primary *cause* of the head-on collision was defendant's driving in the wrong lane of traffic. Investigator Snider's conclusion is fully supported by the record, including, but not limited to, the above summarized evidence and evidence that during the 13-mile police chase, defendant on more than one occasion crossed a double yellow line at a high rate of speed into oncoming traffic, while being pursued by Officer Stehli, clearly to flee from or elude police. (See Veh. Code, § 2800.3, subd. (b).)

### III

### Remaining Contentions

A. *Limiting Instruction: Arizona Guilty Plea*

Defendant contends the court violated his constitutional rights when it failed to give the jury a limiting instruction that it could consider his Arizona guilty plea for felony endangerment only for the purpose of determining whether he was subjectively aware of the risks to human life in fleeing from the police for purposes of showing implied malice. (See *Watson, supra,* 30 Cal.3d at pp. 296–297.)

Briefly, the record shows that when the trial court ruled to admit the Arizona guilty plea, it stated it would give a "properly drafted limiting instruction saying it can

19

only be used for the limited purpose of the defendant's subjective awareness of this type of activity and the dangerousness of this activity." The record also shows defendant neither requested such a limiting instruction nor prepared a "properly drafted" instruction, and the court did not sua sponte give such an instruction.

The People initially contend defendant forfeited this issue because he failed to request such an instruction. Defendant recognizes the forfeiture doctrine but contends it does not apply in his case because of the "narrow exception" to that doctrine, which applies when the evidence is a ""'dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose."'" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590; see Evid. Code, § 355 [providing when evidence is admissible for one purpose and inadmissible for another, "the court upon *request* shall restrict the evidence to its proper scope and instruct the jury accordingly" (italics added)].) Defendant contends that his Arizona guilty plea was in fact a "dominant part" of the People's evidence against him.

We conclude the "narrow exception" to forfeiture does not apply to defendant because we disagree with his contention that the Arizona guilty plea was the "dominant part" of the evidence against him to support his conviction in count 1. As summarized *ante*, Officer Stehli testified defendant in his pickup failed to stop at several stop signs and red light signals, and also crossed double yellow lines and drove into oncoming traffic, during the 13-mile pursuit. This testimony was corroborated by the video from the dashboard camera mounted on his patrol cruiser, which was shown to the jury as Officer Stehli gave his testimony.

20

What's more, the record also includes the testimony of Art Moronez, who witnessed the crash between defendant and victim Morgan, and of CHP Investigator Snider, who opined that the primary cause of the collision that killed Morgan was defendant's decision to drive on the wrong side of a two-lane road. We conclude that the above evidence was far more damaging than defendant's Arizona guilty plea and that, even without regard to that plea, such evidence was more than sufficient to establish the requisite implied malice to support defendant's conviction in count 1. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946 [noting that malice may be, and usually must be, proved by circumstantial evidence, which is ultimately a question for the trier of fact].)

Assuming the issue was not forfeited, we reject defendant's contention that his conviction must be reversed because he allegedly received ineffective assistance of counsel. It is axiomatic that to "show denial of that right, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) the deficient performance prejudiced the defendant. (*Strickland* [*v. Washington* (1984) 466 U.S. 668,] 687, 691-692 [(*Strickland*)] [other citations omitted].) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient. [Citations.] 'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt.' [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.] It is the defendant's burden on appeal to show that he or she

21

was denied effective assistance of counsel and is entitled to relief. [Citation.] '[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence.' [Citation.]" (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016.)

Here, we conclude that even if defense counsel's performance was deficient for failing to request a limiting instruction in connection with defendant's Arizona guilty plea, there was no resulting prejudice because of the overwhelming evidence of guilt, as summarized *ante*. Because defendant on this record has not shown that, but for defense counsel's error, there was a reasonable probability the result of the proceeding would have been different (see *Strickland*, *supra*, 466 U.S. at p. 694), we reject his ineffective assistance of counsel claim. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 40-41 [noting if a defendant fails to establish prejudice, a court of review may reject defendant's ineffective assistance of counsel claim without determining whether defendant's counsel's performance was deficient], disapproved on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

B. *Pinpoint Instruction: Implied Malice*

Defendant next contends the court erred when it refused to give his proposed pinpoint jury instruction regarding implied malice. Relying on a paragraph from the case of *People v. Contreras* (1994) 26 Cal.App.4th 944, 954-955, defendant contends the court should have instructed the jury as follows: "Considerations such as whether the act underlying the homicide is a felony, a misdemeanor or inherently dangerous in the abstract, are not dispositive in assessing whether a defendant acted with implied malice.

22

A finding of implied malice must be based upon considerations of the circumstances preceding the fatal act."

In refusing this instruction, the court found that this proposed instruction was not "particularly well worded"; that while the language may have been appropriate for an appellate decision, it was not appropriate as a jury instruction; and that the court was somewhat confused by the point of this language/proposed instruction because "[i]mplied malice is more than just anytime someone does an inherently dangerous act . . . ."

With regard to the latter point, the court noted that whether an act is inherently dangerous was "something the jury can and should consider in deciding whether or not implied malice is present." The court agreed with defendant that whether an act constitutes a felony or misdemeanor was "not relevant." As such, the court stated if defendant wanted to "redraft something that just goes to felony or misdemeanor, [it] certainly wouldn't have a problem with that, but this notion that you can't consider inherently dangerous or that you can consider it but it's not dispositive, that just gets confusing . . . , and as drafted it's denied."

In explaining the need for the proposed pinpoint instruction, the defense noted its concern that in deciding implied malice, a "juror might be stopping [his or her] analysis at -- at the act alone and not considering everything [he or she is] supposed to consider," and that therefore the proposed instruction told the jury "[t]hey need to consider everything surrounding -- all the circumstances preceding the act."

A trial court is required to instruct jurors on general principles of law relevant to the issues raised by the evidence. (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) Defendants are further entitled, upon request, to instructions that pinpoint the theory of

23

the defense case. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) However, "[w]hen examining whether a court erred in not giving a pinpoint instruction, we are mindful of the general rule that 'a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' ([*People v. Moon* (2005) 37 Cal.4th 1, 30].)" (*People v. Mackey* (2015) 233 Cal.App.4th 32, 111.)

Here, as noted, the jury was instructed with CALCRIM No. 520. Among other instructions, the jury was told that implied malice was a "mental state that must be formed *before* the act that causes death is committed." (Italics added.) It also was told that in determining whether defendant acted with implied malice, it was to consider "all of the circumstances established by the evidence" in determining whether the "natural and probable consequences of the act were dangerous to human life."

The record shows that the defense argued to the jury during closing that the "jury instruction tells you [i.e., the jury] to look at all of the circumstances" in evaluating the issue of implied malice. The record also shows the defense next reviewed "all the circumstances in this case," including, by way of example only, where the pursuit began and ended; the speeds attained during the pursuit; the traffic patterns during the pursuit; and the conduct of Officer Stehli during the pursuit, including using his cell phone to call dispatch while chasing the pickup being driven by defendant. We thus independently conclude the pinpoint instruction proposed by defendant was duplicative of CALCRIM No. 520, particularly when considered in light of the defense's concerns, the alleged need for the proposed instruction and the defense's closing argument.

24

In any event, even if we concluded the court erred in failing to give the proposed pinpoint instruction, we nonetheless would conclude that error was harmless given the overwhelming evidence of guilt, including on the issue of whether defendant harbored the requisite implied malice to support his conviction on count 1.  (See *People v. Hughes* (2002) 27 Cal.4th 287, 363 [noting even if the trial court erred in refusing to give a pinpoint instruction concerning a robbery charge, that error was harmless because there was no reasonable probability the jury would have failed to find a robbery occurred, inasmuch as the jury was properly instructed on the elements of robbery and defense counsel argued during closing the very point addressed in the pinpoint instructed rejected by the court].)

C.  *Abstract of Judgment and Minute Order*

Defendant contends, and the People concede, that the abstract of judgment incorrectly shows that the court imposed a concurrent term on count 5 (i.e., a felon in possession of a firearm) rather than a stayed sentence under Penal Code section 654, subdivision (a), as actually pronounced by the court.  We agree.  Additionally, we note that the minute order dated September 16, 2013 incorrectly identifies the code section for the count 2 conviction as Vehicle Code section 2800.2, when it should be Vehicle Code section 2800.3.

DISPOSITION

The superior court is directed to correct the minute order to reflect defendant's conviction under Vehicle Code section 2800.3, rather than Vehicle Code section 2800.2, and stay under Penal Code section 654, subdivision (a) the sentence on count 5.  The court is further directed to prepare an amended abstract of judgment and to forward a

25

certified copy of the same to the Department of Corrections and Rehabilitation.  In all other respects, the judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

O'ROURKE, J.