Filed 5/24/24  P. v. Dingman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LUCAS DINGMAN,<br><br>     Defendant and Appellant. | D083081<br><br><br>(Super. Ct. No. FVI1501086) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Tony Raphael, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Stephanie A. Mitchell and Elizabeth Sulaiman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Lucas Dingman of the second degree murder of his young son, B.D. In this direct appeal, he raises only a single claim of ineffective assistance of counsel. Because the appellate record does not enable us to conclude that his trial counsel's performance was constitutionally deficient, we reject his claim.

FACTUAL AND PROCEDURAL BACKGROUND

Eleven-month-old B.D. was badly burned when his crib caught fire on the morning of May 20, 2011. Although a neighbor was able to put out the fire with a fire extinguisher, B.D. succumbed to his injuries and died the next day.

B.D. lived with his parents, Dingman and Alicia B., in a two-bedroom apartment in Apple Valley. At the time of the fire, Tailor T. and her her two-and-half-year-old toddler, C.W., were staying in the apartment. Dingman, Alicia, and Tailor were habitual methamphetamine users.

After the fire, drug paraphernalia as well as two BIC lighters were found in the master bedroom where Dingman and Alicia slept. One torch-style lighter[1] was found on the floor of the living room, where Tailor and C.W. slept.

At the trial in 2022, the only question was who started the fire. The prosecution claimed it was Dingman and had charged him with the murder of B.D. The defense claimed the fire was started by C.W. Other than a purported confession that Dingman made to neighbors after the fire—which

---

[1]     The prosecution's arson expert explained that a BIC lighter had "a dancing flame like it would be on a candle" whereas with a torch lighter, "the fire actually comes out almost like a blow-torch style, like a very . . . fine point . . . kind of a forced fuel situation."

the defense argued was a sarcastic comment and not a confession[2]—the only evidence of who started the fire was circumstantial.

One of the critical pieces of evidence offered by the prosecution at trial was a test conducted by Detective Scott Cannon. Dingman had told Cannon during an interview that he thought C.W. set the fire, although he also stated he did not believe C.W. was capable of operating a lighter. On June 14, 2011, Cannon decided to test C.W. with a torch-style lighter similar to the one recovered from the apartment, except that it had been emptied of fuel. The test was videotaped, and the video was shown to the jury as part of the prosecution's case.

The video showed Tailor and C.W. enter an interview room, followed by Detective Cannon and a second law enforcement officer. As Tailor sat in an interview chair with C.W. in her lap, Cannon showed her the test lighter and told her it was similar to the torch lighter recovered from the apartment. Cannon displayed the lighter and demonstrated how it worked, depressing the ignition button repeatedly to confirm that it was out of fuel. As Cannon did this, C.W. reached for the lighter several times. Cannon then handed the lighter to C.W. C.W. put down a stuffed animal he had been clutching and held the lighter in both hands while turning it over and staring at it intently. Cannon adjusted the lighter in C.W.'s hands while saying "this way" (apparently helping C.W. hold the lighter correctly). Cannon took the lighter

---

[2] During an argument with a neighbor after the fire in which the neighbor accused Dingman of killing B.D., Dingman told the neighbor, "Yeah, I know, and I'm gonna get away with it." Alicia and her mother testified that Dingman was being sarcastic, whereas the neighbor and her former boyfriend testified Dingman's tone was calm and not sarcastic.

back, concluding C.W. was unable to light it. The entire transaction took place in about 2 minutes and 2 seconds.[3]

After taking the lighter from C.W., Detective Cannon said to Tailor while showing her the lighter, "we saw him pushing on this thing but he couldn't manipulate it." Cannon explained that he believed the force required to operate the lighter was "a lot . . . for a little kid."

In his closing arguments to the jury, defense counsel argued that C.W. unintentionally started the fire that killed B.D. and that it was "a tragic accident." He called Detective Cannon's test a "Mickey Mouse test" and suggested it failed to demonstrate C.W.'s inability to operate a lighter. At the same time, he urged the jury to replay the video during its deliberations and argued: It would show "how [C.W.] wants that torch lighter. . . . He can't wait to get his hands on it. That tells me he's been around lighters plenty of times. He's had lighters in his hands plenty of times. Now granted, again, he did not light it. But he only had it for 15 seconds before the detective took it from him." Counsel told the jurors, "I'm pretty certain that if he was given the time, he'd be able to do it."

The prosecutor, on the other hand, argued the fire was deliberately set. He relied on the testimony of the prosecution's arson expert, who opined that the fire had been started intentionally by someone who used a heat source (a lighter or a match) to burn three separate holes on the underside of the crib mattress before successfully lighting a flammable blanket inside the crib, and

---

[3]    We have reviewed the videotape in deciding this appeal. According to the time stamp on the videotape, which used a 24-hour format, the meeting with Tailor and C.W. began at 13:08:14 (1:08 p.m. and 14 seconds) and concluded with Detective Cannon taking the lighter from C.W. at 13:10:16 (1:10 p.m. and 16 seconds).

4

that it would have taken up to 30 seconds to create each of the three holes. The prosecutor told the jury it was unreasonable to posit that C.W. started the fire because he physically could not operate the torch lighter or start the fire in the manner described by its expert.  The prosecutor asserted that Alicia and Tailor had not set fire to the crib, and that the only reasonable culprit was Dingman, including because Dingman's statements and behavior tended to demonstrate his guilt.[4]

On the afternoon of its fourth day of deliberations, shortly after reviewing the video of Detective Cannon's lighter test, the jury returned a verdict finding Dingman not guilty of first degree murder and guilty of second degree murder.  The trial court sentenced Dingman to 15 years to life.

## DISCUSSION

Dingman's sole claim on appeal is that his trial counsel provided him with ineffective assistance of counsel.  To succeed, Dingman bears the burden of demonstrating both deficient performance and prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  The standard for assessing defense counsel's performance is "highly deferential."  (*Id.* at

---

[4]     For example, a law enforcement witness testified that during an interview about the fire and B.D.'s death, Dingman and Alicia appeared to be "work[ing] through" what they were going to say, and that Dingman had referred to B.D. as "that fucking kid" and had "chuckled" when discussing with the detective "how hot the fire was burning inside the crib." Additionally, neighbors testified that Dingman would get frustrated with B.D. and that they took care of B.D. the "majority of the time," so often that he had taken his first steps with them and they felt like he was their child. Relying on this evidence, the prosecutor argued, among other things, that Dingman did not have a close relationship with B.D., and that his behavior during the interview was suspicious and was circumstantial evidence of his guilt.

p. 689.)  The defendant must establish that the course of action taken by his trial counsel "fell below an objective standard of reasonableness under prevailing professional norms."  (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*) [cleaned up].)  "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' " (*Ibid.*)

Here, we deal with a claim of ineffective assistance of counsel on direct appeal.  "Certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding.  The record on appeal may not explain why counsel chose to act as he or she did.  Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable."  (*Mickel, supra,* 2 Cal.5th at p. 198 [cleaned up].)

Therefore, "[o]n direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  "[W]here the appellate record does not reveal whether counsel had a legitimate reason for a litigation choice, we generally reserve consideration of any ineffective assistance claim for possible proceedings on petition for writ of habeas corpus."  (*People v. Snow* (2003) 30 Cal.4th 43, 95.)

Dingman contends that his trial counsel's performance was deficient in three respects:  (1) counsel was ineffective for failing to present expert testimony of the rigorousness with which children's ability to perform

6

mechanical tasks can be studied; (2) counsel was ineffective for failing to request a limiting instruction as to the jury's use of the lighter test; and (3) counsel was ineffective for failing to present expert testimony about purported statistical evidence on children causing fires. We conclude the record on appeal fails to substantiate any of these contentions.

1. *Dingman Fails To Establish That His Trial Counsel Was Ineffective for Not Presenting Expert Testimony of the Rigorousness With Which Children's Ability To Perform Mechanical Tasks Can Be Studied*

Dingman acknowledges that his trial counsel had a legitimate tactical reason for wanting the jury to view the video. He claims, however, that his counsel was ineffective because he failed to present evidence demonstrating "that the test could not be trusted *substantively*." Specifically, he contends his counsel should have introduced expert testimony demonstrating that the ability of a child's hand to carry out a mechanical process with a specific device "is a subject that can be, and is, rigorously studied," rather than evaluated in the informal manner employed by Detective Cannon. He bases this contention solely on a case—*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1307—in which the appellate court observed that "[t]he hand size and [firearm] grip strength of children are readily measurable."

We reject this claim because the record before us fails to affirmatively establish that Dingman's trial counsel lacked a legitimate tactical reason for the omission. The record is silent on the reasons why trial counsel did not present such expert testimony. However, the record does show that defense counsel conducted a cross-examination of Detective Cannon during which he succeeded in getting Cannon to admit that he allowed C.W. to hold the torch lighter for only a short period of time and that a longer period would have been appropriate; that Cannon did not use the actual subject torch lighter to conduct the test but instead obtained a new torch lighter from an unknown

7

source; and that Cannon did not have the subject torch lighter tested to determine the pounds per square inch of force required to depress the subject torch lighter's ignition button, even though Cannon knew it was possible to procure such a measurement because his own Glock firearm had previously been tested to determine the pounds per square inch required to pull the gun's trigger. Thus, although defense counsel did not present expert testimony demonstrating that children's mechanical abilities can be studied with more rigor than Cannon employed, it is not the case that counsel failed to elicit evidence of the test's deficiencies.

We agree with the Attorney General that defense counsel may have reasonably concluded his cross-examination sufficiently established to the jury that Detective Cannon's test was substantively flawed, making additional evidence of the test's substantive deficiencies superfluous. Dingman may now believe it would have been preferable for his counsel to further challenge the validity of the test by introducing expert testimony about the possibility of conducting a more rigorous study, but on this record we cannot conclude his counsel lacked a rational tactical reason for proceeding as he did.[5] (See *Strickland*, *supra*, 466 U.S. at p. 689 ["Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance . . . , and it is all too easy for a court, examining counsel's defense after it has proved

---

[5] We note, for example, that after the prosecution's arson expert testified, defense counsel elected not to call the defense's retained arson expert for strategic reasons. He explained that the defense expert's testimony would have undermined the defense case because the defense expert would have had to change his opinions in order to account for new testimony provided by the prosecution's arson expert.

unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."]; *People v. Weaver* (2001) 26 Cal.4th 876, 926 [where counsel's trial tactics "for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions"].)

2.  *Dingman Fails To Establish That His Trial Counsel Was Ineffective for Not Seeking a Limiting Instruction Circumscribing the Jury's Use of the Lighter Test*

Dingman contends his trial counsel was ineffective for failing to argue in limine that the video of Detective Cannon's lighter test "should not be used by the jury to evaluate C[.W.]'s ability to ignite the fire" because the foundational showing for "this sort of experimental evidence" was missing. He argues there were substantial dissimilarities between the test torch lighter and the torch lighter actually recovered from the apartment, and that these dissimilarities would have supported a limiting instruction to circumscribe the purposes for which the jury could use the video of Cannon's lighter test. According to Dingman, his counsel was therefore ineffective for failing to request such a limiting instruction.

The record, however, does not support Dingman's premise of the substantial dissimilarities between the test torch lighter and the recovered torch lighter. He argues the recovered torch lighter lacked a child safety control, whereas it was "unclear" how the lighter used in Detective Cannon's test was configured. This fails, however, to establish that the lighters were, in fact, materially different.[6] And although Dingman also asserts that the

---

6    The record also does not bear out the contention that the torch lighter lacked a child safety control. The prosecution elicited testimony from the neighbor who put out the fire with a fire extinguisher that some torch lighters come with visible child safety tabs that can be removed, while others

9

test lighter had no fuel in it, it is not apparent on the record before us why this difference, on its own, was serious enough to undermine the validity of the test. Further, although Dingman contends his counsel should have sought a limiting instruction, he does not provide us with the content of the proposed instruction.

We are unable to conclude that Dingman's counsel was ineffective for failing to seek an unidentified limiting instruction based on a factual premise the soundness of which is not affirmatively established by the appellate record. A decision not to pursue futile or frivolous motions does not make an attorney ineffective. (*People v. Thompson* (2010) 49 Cal.4th 79, 122 [counsel was not ineffective for failing to move to exclude evidence as irrelevant where the trial record refuted the underlying premise that the evidence was irrelevant].)

Moreover, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance" (*People v. Carrasco* (2014) 59 Cal.4th 924, 985 [cleaned up]), and counsel may, in the exercise of his or her professional judgment, determine that an objection would not result in a more favorable determination for his or her client (*Strickland, supra*, 466 U.S. at p. 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105). Here, Dingman acknowledges that his counsel had legitimate tactical reasons for wanting the jury to see the video. On this

---

are made child safe by "rely[ing] on just . . . pressure." The neighbor was shown the recovered torch lighter, and testified that while it did not have a visible safety, it did not appear to have been tampered with, suggesting it was of the latter variety. The prosecution's arson expert similarly testified that the safety mechanism on torch lighters like the recovered torch lighter "is the . . . fact that it's hard to press down on it" which was "how they're able to sell those [as] child proof."

10

record, we cannot rule out the possibility that defense counsel made a rational strategic decision not to challenge the prosecution's ability to present the video as evidence of C.W.'s *inability* to ignite the fire out of concern the same argument might be turned against the defense and result in a ruling precluding defense counsel from relying on what he believed to be valuable evidence of C.W.'s interest in and likely *ability* to operate the lighter if given sufficient time. In short, the record does not demonstrate that counsel's omission lacked a rational tactical purpose or satisfactory explanation. It is therefore inadequate for us to resolve Dingman's ineffectiveness claim on direct appeal.

3. *Dingman Fails To Establish That His Trial Counsel Was Ineffective for Failing To Present Expert Testimony About Statistical Evidence*

Dingman's third contention is based not on Detective Cannon's lighter test but on certain assertions defense counsel made in his closing arguments to the jury. Defense counsel told the jury, "there are numerous fires caused [by children] between the ages of two and five" and "the majority of fires are caused by children between two and five." The prosecutor objected to this statement as lacking a foundation in evidence, and the trial court sustained the objection and instructed the jury to disregard it. Later, defense counsel again asserted that "kids two and above, they start a lot of fires." This statement, too, was stricken at the prosecutor's request on the ground it lacked foundation. Defense counsel separately argued that the prosecution's arson expert "kn[e]w that two year olds start fires," an argument that drew no objection and which the jury was permitted to consider.

Dingman argues his trial counsel was ineffective because he was aware of "clinical research" bearing directly on the point he was trying to make in closing argument (i.e., the propensity of children ages two and above to "start a lot of fires"), and "expert testimony [on this point] could have been[, but was

11

not,] presented." He contends his counsel should not have attempted to present statistical arguments to the jury "without actually putting on the relevant evidence for the jury to consider."

We reject this contention too because we are unable to conclude on the record before us that Dingman's trial counsel was ineffective for failing to take the course of action he identifies. To begin with, we are not persuaded by Dingman's claim that the record establishes his counsel's awareness of "clinical research" that contained admissible statistical evidence supportive of counsel's closing arguments. Dingman's assertion that his counsel was aware of such evidence is based on an article (the Harpur article[7]) that defense counsel attached to his trial brief in support of an argument related to third-party culpability. We have examined the Harpur article and are unable to conclude it reflects "clinical research" or contains valid or admissible statistical evidence supporting defense counsel's assertions. The data in the article was not the product of a study conducted in a clinical setting; rather, it was extracted from "coronial reports" (presumably, reports prepared by a coroner) of accidental dwelling fire fatalities in Northern Ireland for an 11-year period (January 1999 to December 2009). Further, the article is a study of young fatalities, not young fire-starters. Specifically, it is an examination of risk factors that led young children ages five and under to be at an increased risk of dying in accidental dwelling fires. During the 11-year period examined by the authors, there were a total of 132 accidental dwelling fires in Northern Ireland, 12 of which resulted in the deaths of 14 young

_____

[7]     Harpur, et al., *An Investigation into the Circumstances Surrounding Fatal Dwelling Fires Involving Very Young Children* (2013) volume 61, Fire Safety J., pages 72–82.

children ages five and under.  The article examined only the 12 fires and the 14 young fatalities.  The authors expressly acknowledged this sample was comprised of "insufficient cases . . . to carry out detailed statistical analysis."

Further still, the record contains only an incomplete copy of the article, and the data set forth in the portion of the article that appears in the record fails to support the points defense counsel attempted to make in his closing arguments.  Although there is a table in the article summarizing "[f]atality and incident data," it reflected that of the 14 young fatalities the authors identified, only three were "[i]nvolved with ignition."  Of this subset, one of the fatalities was five years old, one was four years old, and one was two years old.  This information did not have a tendency in reason to substantiate the assertions in defense counsel's closing argument that "there are numerous fires caused between the ages of two and five"; "the majority of fires are caused by children between two and five"; or "kids two and above, . . . start a lot of fires."  (See Evid. Code, § 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].)

And while Dingman quotes a later passage from the article stating in part that seven children "used their parent's [*sic*] lighters/ matches to start the fire," the four pages of the article that preceded this passage are missing.  We cannot determine the ages of the seven children either from the passage quoted by Dingman (which does not provide their ages) or from the context in which it appeared (since that context is not in the record).  Thus, the record fails to establish Dingman's contention that defense counsel, by virtue of his awareness of the Harpur article, was aware of admissible statistical data that could have been used to support defense counsel's arguments that young

13

children are disproportionately involved in starting fires, and that defense counsel was deficient in failing to elicit those statistics from an expert.

Aside from challenging defense counsel's asserted failure to present statistical evidence purportedly reflected in the Harpur article, Dingman also appears to argue that his counsel should have presented expert testimony on some of the article's other assertions about "fire-play," such as that "[a]n interest in fire and fire-play is common among very young children, typically beginning around the age of 2-3," and that "[p]laying with fire is a factor in a small percentage of fatal fires overall but it is a factor in a large percentage of fires involving young child fatalities."

We reject Dingman's argument because it is underdeveloped, as is the record of his counsel's reasons for not presenting such expert testimony. The record does not reveal whether counsel investigated the possibility of presenting expert testimony on the assertions in the article or why counsel did not put on an expert to testify to such assertions. And Dingman does not identify the discipline of the expert he claims his counsel should have called or what counsel would have learned had he interviewed experts in that field. Nor does he attempt to demonstrate that such expert testimony would have been admissible under California law or that the failure to call any such expert caused counsel's performance to fall below an objective standard of reasonableness. It is not our role to develop such arguments for him. (*In re Adrian L.* (2022) 86 Cal.App.5th 342, 344, fn. 1.) Further, the portions of the Harpur article that appear in the record do not state that the article was peer reviewed. Without the aid of an appropriate expert declaration, we are unable to independently determine whether the assertions in the lone study of dwelling fires in Northern Ireland reflected the existing and relevant state of scientific knowledge in the field. Given the limitations of the appellate

14

record, we cannot rule out the possibility that defense counsel interviewed experts and elected not to call an expert to testify about the information in the article for valid strategic reasons—including, for example, a desire not to reveal to the jury the relative infrequency with which two-year-olds were determined in the article's study to succeed in starting fires.

It is telling that the cases on which Dingman relies to establish his counsel's ineffectiveness are all habeas corpus cases in which the defendant submitted evidence outside the trial record, such as declarations from expert witnesses establishing the insufficiency of the defense attorney's litigation strategy. (See *In re Sixto* (1989) 48 Cal.3d 1247, 1259–1261 [defense counsel ineffective for failing to present expert testimony on PCP ingestion]; *In re Hill* (2011) 198 Cal.App.4th 1008, 1026 [defense counsel ineffective for failing to request colposcopic images or obtain assistance of independent medical expert to present medical defenses to sexual offenses]; *Lindstadt v. Keane* (2d Cir. 2001) 239 F.3d 191, 201–204 [defense counsel ineffective based on cumulative trial errors, including failure to challenge prosecution expert's vague references to medical studies purportedly supporting inculpatory opinions].) Unlike these cases, here we have only the trial record, which provides us with an insufficient basis for finding that Dingman's trial counsel's performance fell below an objective standard of reasonableness. (See e.g. *In re Long* (2020) 10 Cal.5th 764, 773 [to succeed on a claim of ineffective assistance of counsel, the defendant must show his counsel's omission "fell below an objective standard of reasonableness in light of the professional norms prevailing when the representation took place" (cleaned up)]; *Mickel, supra*, 2 Cal.5th at p. 198 [practical constraints of a direct appeal may leave the reviewing court with "no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or

15

whether counsel's actions or failure to take certain actions were objectively unreasonable"].)

In sum, we are unable to conclude on the basis of the appellate record that defense counsel's performance was constitutionally deficient. Although it may be that further investigation will reveal additional evidence substantiating Dingman's ineffectiveness claims, the facts necessary to support such claims do not presently appear in the record before us. Consequently, we reject Dingman's ineffective assistance claims "without prejudice to any rights [he] may have to relief by way of a petition for writ of habeas corpus." (*People v. Garrido* (2005) 127 Cal.App.4th 359, 367.)

## DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:

IRION, Acting P. J.

CASTILLO, J.